(Nos. 46334, 46342 cons.—

SOUTHERN ILLINOIS ASPHALT COMPANY, INC., Appellee, v. THE POLLUTION CONTROL BOARD *et al.*—(Environmental Protection Agency *et al.*, Appellants.)—AIRTEX PRODUCTS, INC., Appellee, v. THE POLLUTION CONTROL BOARD *et al.*—(Environmental Protection Agency *et al.*, Appellants.)

*Opinion filed March 24, 1975.*

William J. Scott, Attorney General, of Springfield (Larry R. Eaton, Assistant Attorney General, of counsel), for appellants.

Craig & Craig, of Mt. Vernon (Howard W. Campbell and Terry R. Black, of counsel), for appellee Southern Illinois Asphalt Company.

Arvey, Hodes & Mantynband, of Chicago (J. Herzl Segal, Charles J. O'Connor, and Lawrence C. Rubin, of counsel), for appellee Airtex Products, Inc.

. MR. JUSTICE RYAN delivered the opinion of the court:

In each of these consolidated cases the Appellate Court for the Fifth District, with one justice dissenting, held that the imposition of a discretionary monetary penalty by the Pollution Control Board under the authority of section 42 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1042) is invalid. (*Southern Illinois Asphalt Co. v. Environmental Protection Agency* (1973), 15 Ill. App. 3d 66; *Airtex Products, Inc. v. Pollution Control Board* (1973), 15 Ill. App. 3d 238.) We granted leave to appeal, and the cases were consolidated for decision and opinion in this court. We had previously granted leave to appeal in *City of Waukegan v. Environmental Protection Agency* (1973), 11 Ill. App. 3d 189, which had likewise held invalid the imposition of a fine by the Pollution Control Board. Thus, this common constitutional issue was under consideration in this court. In *City of Waukegan v. Pollution Control Board* we held that the imposition of a monetary penalty by the Pollution Control Board is constitutionally permissible (57 Ill.2d 170). This holding is dispositive of the same issues in *Southern Illinois Asphalt Co.* and in *Airtex Products, Inc.*

Other issues have been raised in this court by the appellees, which they may properly do pursuant to Rule 318(a) (50 Ill.2d R. 318(a)). This fact prevents the disposition of these cases on the constitutional issue decided in *City of Waukegan.* However, one issue common to both cases is dispositive. Both appellees contend that the fines imposed by the Pollution Control Board were arbitrary and not authorized in light of mitigating circumstances. Because we find that the Board erred in imposing the fines, we need not decide or discuss the other issues

raised by the appellees.

The Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1001 *et seq.*) provides for both civil (section 42) and criminal (section 44) penalties. (Ill. Rev. Stat. 1971, ch. 111½, pars. 1042, 1044.) The criminal penalty is obviously intended to be punitive. The fact that the Act contains two separate provisions imposing sanctions indicates the intention of the legislature to prescribe civil sanctions for a different purpose. (*Cf. Helvering v. Mitchell* (1938), 303 U.S. 391, 401-405, 82 L. Ed. 917, 923-925, 58 S. Ct. 630.) In *City of Monmouth v. Pollution Control Board* (1974), 57 Ill.2d 482, 490, we stated: "The legislative declaration of the purpose of the Act (par. 1002) indicates that the principal reason for authorizing the imposition of civil penalties (par. 1042) was to provide a method to aid the enforcement of the Act and that the punitive considerations were secondary." We there held that the Board erred in imposing a fine upon the City of Monmouth.

Traditionally, courts have carefully avoided encroaching upon the power which the legislature has vested in an administrative body. That does not mean, however, that all administrative determinations are sacred and beyond the reach of the courts. Where an administrative order is against the manifest weight of the evidence or where the agency has acted arbitrarily or capriciously and has thereby abused the discretion vested in it, the courts should not hesitate to intervene. *Dorfman v. Gerber* (1963), 29 Ill.2d 191; *Bruce v. Department of Registration and Education* (1963), 26 Ill.2d 612.

In upholding the authority of the Board to impose civil penalties we recognized in *City of Waukegan* that the Act contained sufficient built-in safeguards. We found that the guidelines set forth in section 33(c) of the Act afforded protection against arbitrariness on the part of the Board. Section 33(c) requires that in making its orders and determinations the Board *shall* take into consideration "all

the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to: ***." The Act then provides four specific areas which the Board must consider. The Board is not limited, however, to. the consideration of these four specified areas, but, as noted above, it is required to consider *all facts and circumstances bearing upon the reasonableness of the conduct.* We have recently held that the provisions of section 33(c) establish the criteria for determining an unreasonable interference with the enjoyment of life or property as that phrase is used in section 3(b) of the Act. (*Incinerator, Inc. v. Pollution Control Board* (1974), 59 Ill.2d 290.) However, the standards of section 33(c) are also relevant standards which the Board must consider in mitigation or aggravation in determining the particular action to be taken or penalty to be imposed under section 33(b) of the Act.

Obviously the General Assembly did not intend that the Pollution Control Board should impose a monetary fine in every case of a violation of the Act or regulations. Section 33(a) provides that the Board, following a hearing, shall enter such order "as it shall deem appropriate under the circumstances." Section 33(b) provides that the order *may* include a direction to cease and desist "and/or the imposition by the Board of civil penalties in accord with Section 42." (Ill. Rev. Stat. 1973, ch. 111½, par. 1033(b).) Section 42 authorizes the imposition of a civil penalty of *not to exceed* $10,000 for the violation and an additional civil penalty of *not to* exceed $1,000 for each day during which the violation continues. Implicit in the grant of the discretionary authority to impose monetary civil penalties in varying amounts is the requirement that the severity of the penalty should bear some relationship to the seriousness of the infraction or conduct. (See W. Gellhorn, *Administrative Prescription and Imposition of Penalties,* 1970 Wash. U.L.Q. 265, 271.) In determining if a civil penalty is warranted and, if so, the amount of the penalty,

the Board must be governed by the considerations required by section 33(c).

Arguably, the imposition of a civil penalty for each violation may deter further violations by the one penalized or by others, thus aiding in the administration of the Act. However, the Pollution Control Board itself has recognized that the arbitrary imposition of penalties can in fact hinder the fulfillment of the purpose of the Act. In *Employees of Holmes Bros. v. Merlan, Inc.* (1971), 2 Ill. P.C.B. Op. 405, 409, the Board stated:

> "In the opinion of the Board, Merlan has exercised good faith in trying to control its problems, and to penalize a company such as this would discourage all those who act in good faith to bring an end to their pollution problems."

As we held in *City of Monmouth,* it is plain that the General Assembly intended to vest the Board with broad discretionary powers in the imposition of civil penalties. It is equally plain that its orders and determinations are subject to judicial review, and in order to be sustained must find support in the record. In each of these consolidated cases we can only conclude that the record does not support the imposition of the civil penalty. The record contains substantial evidence in both cases which indicates that the imposition of the penalty would not aid the enforcement of the Act. In both cases the violations had ceased long before the Environmental Protection Agency instituted action before the Pollution Control Board based upon such violations. In both cases there are substantial mitigating circumstances which cast shadows of arbitrariness upon the penalties.

The case of Southern Illinois Asphalt Co. involves air pollution under Title II of the Act (Ill. Rev. Stat. 1971, ch. 111½, pars. 1008 through 1010). The Environmental Protection Agency filed a complaint with the Pollution Control Board charging that the company had installed an asphalt plant in McLeansboro, Illinois, without having

secured a permit from the Environmental Protection Agency in violation of section 9(b) of the Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1009(b)) and Rule 3—2.110 of the rules and regulations of the Pollution Control Board governing the control of air pollution. The Board found against Southern, ordered it to cease and desist the operation of its McLeansboro plant and fined it $5,000 for failure to secure a permit. It should be noted that Southern was not charged with polluting the air. In fact all of the evidence was to the effect that this plant was an extremely clean plant and that the emissions were well below the acceptable emission standards established by the Board. The plant began operation early in September, 1970, and ceased operation about December 1, 1970, and has not operated since. The complaint against Southern was not filed until February 26, 1971, after the plant had ceased operation.

The failure to obtain the permit was pure inadvertence. There was no need to assess a penalty in aid of the enforcement of the Act because Southern had ceased operating prior to the filing of the complaint. The fine could not be imposed as a penalty for any consequences of polluting the air since Southern had not been charged with air pollution. The fine was an arbitrary penalty and further unjustified in view of the mitigating circumstances shown by the evidence.

A short time before constructing the plant at McLeansboro and installing the pollution-control equipment Southern had also constructed an asphalt plant in Mt. Vernon, Illinois, and had installed the same pollution-control equipment in that plant. Southern procured the pollution-control equipment for both plants from the same supplier. In the case of the Mt. Vernon plant the supplier had filled out the application forms for the permit and had filed them with the Agency prior to the commencement of operation. However, the actual permit to install the equipment was not received by Southern until several

weeks after operation had commenced. All the evidence indicates that Southern believed the same procedure was being followed at McLeansboro. Since the permit at Mt. Vernon had not been received until after operations had commenced, Southern logically assumed the permit at McLeansboro would be forthcoming. When Southern became aware that the permit to construct and install this equipment had not been applied for, it had the supplier fill out and file the application forms for the McLeansboro plant. This was done in December, 1970. The agency denied the application for the permit in February, 1971, and a few days later filed its complaint against Southern with the Pollution Control Board. However, as earlier noted, the plant had ceased operating in December. During the brief period that the plant had been in operation various environmental officers employed by the State of Illinois had visited the plant, commented on the clean operation and generally left the officers of Southern with the impression that there had been full compliance with the Act and the regulations.

The Pollution Control Board has recognized the inappropriateness of imposing a civil penalty in a situation such as this. In *Environmental Protection Agency v. Beloit Foundry Co.* (1971), 2 Ill. P.C.B. Op. 719, 720, the Board stated:

> "The remaining issue is money penalties. In light of the company's good faith reliance on the manufacturer's guarantee and of its commendable action in proceeding with a stack test and with plans to correct the deficiency, we think no such penalty is necessary."

The record discloses the same good-faith reliance by Southern on its supplier, who had previously applied for and secured a permit for the Mt. Vernon plant. The company was operating an asphalt plant which complied with all requirements, except no permit for the original installation had been applied for. The plant had been

inspected on different occasions by State employees who did not inform the company that no permit had been issued. As soon as the company learned that there had been no permit, it immediately took steps to remedy this situation, and the company had ceased operation long before the complaint was filed with the Pollution Control Board. The imposition of a civil penalty in this case can only be viewed as punishment for this inadvertance and is not required as an aid in the enforcement of the Act. The imposition of this penalty constitutes an arbitrary abuse of discretion.

The other case in this consolidated appeal involves water pollution under Title III of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, pars. 1011 through 1013). Airtex Products, Inc., presents a case of cooperation, in some ways similar to the situation in *City of Monmouth*. Airtex operated two plants in Fairfield, Illinois, where automobile parts were made and assembled. In one of the plants cyanide was used in a plating operation. Through the water used in a rinsing process some of the cyanide was discharged into a storm sewer of the city of Fairfield. On October 20, 1967, Airtex received a copy of a letter which the Illinois Sanitary Water Board had sent to the city of Fairfield advising that cyanide had been found in the city storm sewer by a State engineer. The letter also stated that the discharge of cyanide into the storm sewer is disallowed in any concentration. The rules and regulations of the Illinois Sanitary Water Board, SWB—5 provided:

"Rule 1.01 Any person, firm or corporation engaged in manufacture or other process, including deactivation of processes, in which cyanides or cyanogen compounds are used shall have each and every room, where said compounds are used or stored, so constructed that none of said compounds can escape therefrom by means of building sewer, drain or otherwise directly or indirectly into any sewer system or watercourse.

Rule 1.02 On application by a municipality to and

approval by the Sanitary Water Board, limited amounts not to exceed two (2) milligrams per liter, may be permitted to be discharged to a municipal sewer system and sewage treatment works, when determined it would not be detrimental to public health or municipal sewage treatment works operation or which would not pollute any lake, river, stream, drainage or roadside ditch or other watercourse."

On the effective date of the Environmental Protection Act, July 1, 1970, these rules remained in effect pursuant to the provisions of section 49(c) of the Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1049(c)). Section 12(a) of the Act provides:

"No person shall: (a) Cause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act."

Again on December 15, 1967, the Sanitary Water Board wrote to the city of Fairfield and forwarded a carbon copy of the letter to Airtex. The letter advised that since the original correspondence of October 20, 1967, additional samples had been taken from the city's storm sewers and the samples again showed the presence of cyanide. The letter again advised that the discharge of cyanide into a watercourse is prohibited. However, it called the attention of the city council and Airtex to the provisions of Rule 1.02 which outlines the procedure by which approval may be granted for limited discharge of cyanide to a sanitary sewage-treatment facility. During 1967 and 1968 Airtex, the city of Fairfield and the Sanitary Water Board exchanged correspondence concerning the attempt by Airtex to reduce the amount of cyanide in the waste water. The correspondence indicates that several meetings were held between representatives of Airtex and the Sanitary Water Board and that efforts were constantly being made to eliminate the discharge of

contaminants into the city storm-sewer system. Although Airtex was in violation of the regulations by discharging water containing cyanide into the storm sewer, the correspondence exchanged during 1967 and 1968 between the city, the Sanitary Water Board and Airtex discloses a cooperative effort by these three parties to reduce the amount of cyanide being discharged into the water to a point which, under Rule 1.02, could permissibly be discharged into the city sanitary sewer.

In July, 1969, Airtex requested the city of Fairfield to be allowed to divert the waste water from the plating operation into the city of Fairfield sanitary sewer and informed the city that the water it proposed to allow to enter the sanitary sewer system was well below the established limits of cyanide content established by the rules of the Board. Airtex requested that the city secure the necessary permission from the Sanitary Water Board. On August 5, 1969, the Sanitary Water Board replied to the city of Fairfield's request and informed it that certain engineering data and plans must be submitted. On November 5, 1969, the Sanitary Water Board wrote a letter to Airtex informing it that it was necessary for the municipality to make the application for permission to discharge the cyanide-bearing waste into the municipal sewage-treatment system and advised Airtex that it was necessary to submit plans and specifications concerning its proposed disposal of the waste into the city's sewer system. A previous letter from the Sanitary Water Board to the city had stated: "That in order to comply with the regulations, new construction or alterations should not be started until the plans have been approved by this Board." Airtex had received a copy of this letter.

On December 1, 1969, the city of Fairfield wrote to Airtex and stated that in reply to its letter concerning the possible discharge of the industrial waste into the sanitary sewer system the city felt that, on the basis of discussions with its engineers and with the Sanitary Water Board,

Airtex could be permitted to discharge its industrial waste into the sewer system but that it was necessary for Airtex to supply certain information which was outlined in the letter. In reply to this request, Airtex furnished the information to the city along with its proposed plans for treating and dispersing cyanide. On December 24, 1969, Airtex informed the Sanitary Water Board that it had forwarded to the city of Fairfield all information and data and blueprints which the Board had suggested. On January 27, 1970, the Board wrote to the city of Fairfield and informed it that it had received information from Airtex that necessary data and information had been forwarded to the city. The Board inquired as to the status of the review of this information by the city and requested that it be forwarded to the Board for its review and appropriate action. On May 15, 1970, Airtex wrote a letter to the city of Fairfield stating that it had received a copy of the January 27 letter which the State had written to the city inquring concerning the matter under consideration, and informed the city that it had heard nothing since it had submitted its plans and drawings to the city in December of 1969. The letter concluded by saying that Airtex had not proceeded with the intended plans pending authorization by both the city and the State of Illinois.

The city of Fairfield had not filed the application with the Sanitary Water Board requesting permission for Airtex to discharge its waste into the sanitary sewer system because its engineers had informed the city that the plans which had been submitted by Airtex were lacking in detail. However, Airtex was never informed that its plans were unsatisfactory until after it was found to have violated the Act.

Shortly after the Environmental Protection Agency succeeded to the duties of the Sanitary Water Board its agents took water samples on May 4 and again on May 14, 1971, and stated that on both dates Airtex had discharged cyanide into the storm sewer of the city of Fairfield. The

storm sewer is not a part of the Fairfield sanitary sewer system. On May 14, 1971, the Environmental Protection Agency sent a telegram to the mayor and city council of the city of Fairfield and informed them that an analysis of samples collected from the city storm sewer receiving waste water from Airtex showed a highly toxic pollutional discharge from the city storm sewer to the waters of the State and informed it that any further discharge of toxic wastes into or from the city storm-sewer system must cease immediately. On May 28, 1971, Airtex wrote a letter to the director of the State Environmental Protection Agency informing it that all plating operations of Airtex products had been suspended on May 15, 1971. On October 15, 1971, the Environmental Protection Agency filed its complaint with the Pollution Control Board.

On February 3, 1972, the Pollution Control Board entered its order which contained an order to cease and desist and which imposed upon Airtex a fine of $11,000 "as a penalty for the violations found in this proceeding." Here, as in Southern Illinois Asphalt Co., the record does not support the imposition of a civil penalty. The fine under the state of this record is purely punitive. It was not required as an aid in the enforcement of the Act. The violation ceased immediately upon the receipt of the telegram of May 14, 1971, five months before the complaint was filed against Airtex. From 1967 until the receipt of the telegram, Airtex had been diligently trying to bring its operations into conformity with the rules. The record does not indicate that Airtex was dilatory or recalcitrant. It should not be subjected to a monetary fine for its efforts. The Pollution Control Board in *Employees of Holmes Bros. v. Merlan, Inc.* (1971), 2 Ill. P.C.B. Op. 405, 409, stated:

> "It is certainly the policy of this Board not to penalize those who are honestly trying, which is certainly the case here."

We agree with the policy of the Board thus stated and find

the imposition of the civil penalty of $11,000 against Airtex to be an arbitrary abuse of the discretion vested in the Pollution Control Board.

The appellate court was in error in holding that the imposition of monetary penalties under the Act is constitutionally impermissible. However, the penalties in both cases were unauthorized under the facts of each case. The judgments of the appellate court, therefore, in Southern Illinois Asphalt Co. and in Airtex Products, Inc. are affirmed.

*Judgments affirmed.*