THE CITY OF CHICAGO, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (1st Division)   No. 76-1430

Opinion filed February 6, 1978.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Edmund Hatfield, Assistant Corporation Counsel, of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (Anne K. Markey, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Respondent Illinois Environmental Protection Agency filed four complaints against petitioner City of Chicago. The complaints were filed before respondent Illinois Pollution Control Board and involved three incinerators and one landfill operated by petitioner. However, only that portion of respondent Pollution Control Board's order concerning the Southwest Incinerator is the subject of this action.

The substance of the complaint alleged that petitioner operated the incinerator without a State permit in violation of section 49(c) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1049(c)) and that the incinerator discharged particulate matter in violation of section 9(b) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1009(b)).

Petitioner stipulated to the violations and both parties later reached a settlement. However, after a hearing, respondent Illinois Pollution Control Board assessed a fine of $10,000 against petitioner.

From that order and pursuant to statute section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1041), petitioner filed an administrative review proceeding directly with this court. Petitioner argues that imposition of the fine was arbitrary and capricious inasmuch as petitioner cooperated fully with the Illinois

Environmental Protection Agency and could take no further action to remedy the violations.

We reverse and remand with directions.

In 1973, respondent Illinois Environmental Protection Agency (hereinafter referred to as EPA) filed four complaints with respondent Illinois Pollution Control Board against petitioner City of Chicago. The subject of three of the complaints was three large incinerators operated by petitioner for the disposal of solid waste. The incinerators are known as the Southwest Incinerator, the Northwest Incinerator, and the Calumet Incinerator. Involved in the fourth complaint was a large sanitary landfill known as Stearns' Quarry, used for the disposal of the residue from the three incinerators. On motion of the EPA, the four cases were consolidated by order of the Pollution Control Board (hereinafter referred to as the Board).

Petitioner does not question the final disposition of three of the cases. It is only the action taken by the Board with regard to the Southwest Incinerator which caused this proceeding to be brought. Consequently, our discussion will be limited primarily to the circumstances surrounding the Board's order concerning that facility.

Count I alleged that the Southwest Incinerator, which is comprised of four furnaces and two chimneys, was operated by petitioner so as to cause the discharge of various contaminates into the atmosphere. The discharge was alleged to be of sufficient duration to constitute air pollution as defined by section 3(b) of the Environmental Protection Act. Ill. Rev. Stat. 1971, ch. 111½, par. 1003(b).)

Count II accused petitioner of allowing the discharge of particulate matter into the atmosphere in amounts in excess of and in violation of section 9(c) of the Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1009(c)).

Count III alleged that petitioner operated the Southwest Incinerator without a State permit in violation of section 9(b) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1009(b)). Count III, as well as counts I and II, prayed for a cease and desist order and the imposition of a fine.

Petitioner was aware of problems with its method of solid waste disposal before the complaints were filed in 1973. In 1970, a study of the solid waste problem facing petitioner was undertaken by an interdepartmental committee representing the Department of Streets and Sanitation, Public Works, and Environmental Control. The study concluded that alternative methods were necessary to achieve an optimum program because existing facilities were operating on extended schedules. In 1972, as a direct result of this study, petitioner converted the Medill Incinerator, the oldest of petitioner's four incinerators, into a

transfer station. It was determined that upgrading the incineration equipment to meet modern air pollution standards was not economically feasible.

In 1973, the EPA filed the four complaints against petitioner. Before a hearing on these complaints could be held, petitioner initiated an action in the circuit court of Cook County to enjoin the board from hearing the three incinerator cases. Petitioner also filed a companion suit to enjoin administrative action against the landfill. The position argued by petitioner in these suits was that as a home-rule unit under section 6 of article VII of the 1970 Illinois Constitution, it was not subject to the Illinois Environmental Protection Act. The circuit court accepted this view and granted both preliminary and permanent injunctions.

Further proceedings in these cases were suspended by the Board until November 27, 1974, when the Illinois Supreme Court reversed the judgment of the circuit court. (*City of Chicago v. Pollution Control Board* (1974), 59 Ill. 2d 484, 322 N.E.2d 11.) The court held that the Environmental Protection Act is not inconsistent with the 1970 Constitution and is binding upon local governmental units. As a result of this decision, the Board resumed its proceedings against petitioner.

In 1973, petitioner also engaged a private engineering firm to evaluate and make recommendations concerning petitioner's method of solid waste disposal. The study concluded that incineration should be abandoned in favor of a shredding process. Shredded combustibles could then be sold to a generating station of the Commonwealth Edison Company for use as a fuel supplement, while noncombustibles could be used for landfill purposes. The study noted that while the Southwest Incinerator incinerated 20% of the refuse collected by petitioner, strict compliance with air pollution regulations would require that operations be suspended for two years while pollution control equipment was installed.

As a result of this study, petitioner decided to abandon operations at the Southwest Incinerator in favor of the fuel supplement plant. Because the decision was made to terminate operations at the Southwest Incinerator by 1975, the addition of modern air pollution control equipment was deemed economically infeasible.

While the fuel supplement plant was scheduled to become operational by 1975, the date was postponed until March 31, 1977. The postponement was due to a strike in the concrete industry, construction delays and design modifications. In the interim, petitioner hired an engineering firm to discover procedures by which stack emissions could be reduced while the new plant was being completed. The suggestion given, which was subsequently adopted by petitioner, was to decrease the amount of waste incinerated. According to petitioner, this practice decreased stack

emissions and at the same time, was consistent with the eventual phase-out of the facility.

During the hearings before the Board, petitioner and the EPA stipulated to the above facts. Mr. Benedetto, the attorney representing the EPA, further informed the Board that ever since the supreme court removed the injunction obtained by petitioner, petitioner had "been very cooperative in providing the State with information regarding its facilities and submitting permit applications for all of its facilities."

During the course of these proceedings, petitioner and the EPA were able to reach a settlement. However, left unresolved was the issue whether a penalty should be imposed. In this regard, Mr. Benedetto told the Board "to do whatever they want with respect to a penalty, if they wish to impose one at all."

After hearing all of the evidence, the Board imposed a penalty of $10,000 against petitioner. In the order imposing the fine, the Board stated that "imposition of the penalty will serve to aid in the enforcement of the Act by working to secure voluntary compliance with the Act in other cases, especially by the City of Chicago and this its other facilities."

On appeal, petitioner argues that imposition of the penalty was arbitrary and capricious inasmuch as petitioner cooperated fully with the EPA and could take no further feasible steps to decrease stack emissions.

We agree. In *City of Waukegan v. Pollution Control Board* (1974), 57 Ill. 2d 170, 311 N.E.2d 146, the Illinois Supreme Court upheld the provision of the Environmental Protection Act which authorizes the Board to impose upon any person who violates its provisions or any regulation adopted by the Board pursuant to the Act, a civil penalty of not to exceed $10,000 for said violation and an additional civil penalty of not to exceed $1000 for each day which such violation continues.

■■ It has also been held that the severity of the penalty should bear some relationship to the seriousness of the infraction, that the imposition of a penalty is not required in every case and when a civil penalty is imposed, the primary purpose must be to aid enforcement of the Act and punitive considerations must be secondary. (*Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406.) Two other considerations are the polluter's sincere desire to eliminate or reduce the pollution (*Bresler Ice Cream Co. v. Pollution Control Board* (1974), 21 Ill. App. 3d 560, 315 N.E.2d 619) and the technical and economic reasonableness of curbing said pollution.

■■ Under the facts presented in the instant case, we consider the imposition of the $10,000 penalty not proper. First, petitioner demonstrated a sincere desire to eliminate, or at least reduce, stack emissions. In 1970, petitioner realized its method of solid waste disposal was not in compliance with clean air standards. As a result, a study was

undertaken to seek alternative methods. In order to reduce stack emissions, petitioner converted its oldest incinerator, the Medill Incinerator, into a transfer station in 1972. While no action was taken on the Southwest Incinerator at that time, it must be remembered that petitioner operates several incinerators and because of economic and other factors, cannot be expected to make substantial changes on all of them at the same time.

In 1973, the EPA initiated four complaints against petitioner. Believing itself outside the jurisdiction of the EPA, petitioner obtained an injunction preventing the EPA from continuing with these proceedings. However, during this time, petitioner continued seeking methods of reducing stack emissions from all of its incinerators, particularly the Southwest Incinerator. Petitioner hired a private consulting firm that recommended abandoning operations at the Southwest Incinerator in favor of a shredding facility. This recommendation was later adopted.

We note there is the testimony of one of the attorneys for the EPA who noted how cooperative petitioner had been. This fact is consistent with petitioner's other efforts to reduce stack emissions and further demonstrates a sincere desire to minimize air pollution.

■■ Secondly, the Board's order failed to consider economic and technological factors. In 1973, petitioner decided to abandon operations at the Southwest Incinerator. This decision was precipitated by the fact that strict compliance with air pollution regulations would require that operations be suspended at that facility for two years while pollution control equipment was installed. Because the disposal of waste is a function crucial to the very existence of any large city, petitioner opted for building the fuel supplement plant rather than suspending operations while pollution control equipment was installed.

While the fuel supplement plant was being constructed, petitioner did not install pollution control devices at the Southwest Incinerator because modifications of a substantial nature would require that the facility be closed down for at least two years. Those of a minor nature would be economically infeasible, due to the fact that operations there were to be terminated in two years. Thus, there was really very little that petitioner could do to reduce stack emissions. Because these factors substantially affected petitioner's conduct, they should have been considered by the Board. *Metropolitan Sanitary District v. Pollution Control Board* (1975), 62 Ill. 2d 38, 338 N.E.2d 392.

Lastly, there remains the issue of the penalty imposed. The Illinois Supreme Court held that when a civil penalty is imposed, the primary purpose must be to aid enforcement of the Environmental Protection Act and punitive considerations must be secondary. (*Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406.) We

believe that punitive considerations were not of secondary importance here. Under the Act, the maximum penalty the Board can impose is $10,000 plus $1000 a day for each day the violation continues. (Ill. Rev. Stat. 1975, ch. 111½, par. 1042(a).) However, even though there were facts present that tended to mitigate petitioner's violation of the Act, the Board still imposed a large penalty. Also, there is the fact that the attorney for the EPA did not seek a penalty in this case. He stated that the Board could "do whatever they want with respect to a penalty, if they wish to impose one at all." Thus, it can be inferred that the EPA was not seeking a penalty, but rather left the question to the Board.

Consequently, we believe the Board's primary purpose in imposing a penalty was to make an example out of petitioner. Such a purpose is improper and in this case violated the requirement that the penalty bear some relationship to the seriousness of the infraction.

Lastly, respondents argue that in those cases where a penalty imposed by the Board was reversed, the polluting party had taken steps to correct the situation before a complaint was filed. We feel such is also the situation in the present case. Here petitioner began taking measures to improve its method of disposing solid wastes in 1970, three years before the complaint was filed. Many of the considerations facing petitioner directly involved the public sector. The public would be the ultimate loser if petitioner were to shut down operations. We think the petitioner acted as reasonably as it could to comply with the requirements of the Act and in fact, complied with those requirements.

For the foregoing reasons, the order of the Pollution Control Board with respect to the Southwest Incinerator penalty is reversed and the cause is remanded with instructions that the penalty be vacated.

Order reversed; cause remanded with directions.

GOLDBERG, P. J., and O'CONNOR, J., concur.