THE CITY OF EAST MOLINE, Petitioner, v. THE POLLUTION CON-
TROL BOARD *et al.*, Respondents.

Third District   No. 3—84—0766

Opinion filed September 16, 1985.

Alan G. Blackwood, of Schrager, Blackwood & Nowinski, P.C., of Moline, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (William J. Barzano, Jr., and Nancy J. Rich, Assistant Attorneys General, of Chicago, of counsel), for appellee.

JUSTICE STOUDER delivered the opinion of the court:

The Illinois Environmental Protection Agency (Agency) filed an 11-count complaint with the Pollution Control Board (Board) charging the city of East Moline (city) with statute, regulations and rules violations in the management and operation of a sanitary landfill. After hearings before a hearing officer of the Board and arguments to the Board, the city was held to have committed all of the violations charged. It was assessed a penalty of $30,000, and its permit to operate the landfill was revoked. The city is seeking direct review of the Board's order in this court.

The city owns and operates a sanitary landfill in Rock Island County. The Agency issued the city an original operating permit on September 23, 1971. In the ensuing years, the city operated the landfill and accepted waste essentially from its residents. Several supplemental permits were also granted to the city. On April 8, 1974, a permit was issued allowing the city to accept digested sludge.

In January 1983, the Agency filed its complaint detailing and describing the city's violations of its permit, the statute and regulations applicable to the operation of sanitary landfills. At the hearing, the nine Agency inspectors who had visited the East Moline landfill over the period of alleged violations (1973-1982) testified. The Agency also introduced inspection reports, sketches and photographs documenting at least 62 inspections. The director of public services and the assistant director for the city of East Moline testified on behalf of the city.

On this appeal, the city argues the Board erred in three respects. First, the Board improperly excluded the city's exhibit No. 48 which was a copy of a memorandum dated November 9, 1981, from Joseph Podlewski to Gene Theios, both employees of the Agency, second, the conclusion of the Board that the city violated the Act as charged in counts VII and VIII is contrary to the manifest weight of the evidence and third, the penalties imposed by the Board are excessive, are not supported by the evidence and are an abuse of discretion.

The first question we shall consider is whether the Board properly excluded the city's exhibit No. 48 as irrelevant hearsay.

In the summer of 1982 Steve Verdick and Donald Anderson and

other city officials went to Springfield to review Agency files on the landfill. Joseph Podlewski, the Agency's attorney, presented them with various documents. They received copies of some documents and separately transcribed the contents of others. Exhibit No. 48 was a transcription of the contents of an actual memo from Podlewski to a fellow employee dated November 9, 1981. That exhibit was written by Anderson, one of the city's employees, in the presence of Verdick, who watched it being written. Podlewski was present at the time.

The memo first became an issue as a result of a request to produce it filed by the city. The Agency resisted. The hearing officer, after reviewing the original memo *in camera*, ordered it to be produced.

Verdick, in his testimony, identified the copy of the memo as transcribed by Anderson, who was unavailable to testify. Whether the original of the memo was turned over to the city as directed by the hearing officer is unclear from the record. In any event, no claim was made that the copy was not true and accurate.

The memo from Podlewski was a response to an inquiry from Theios, permit section manager. According to the memo, Podlewski indicated the city's violations were not serious enough to require a hearing on its pending permit application. If alleged violations of existing permits or regulations are serious enough so that if proved a pending application should be denied, a hearing on such alleged violations is required under the ruling in *Martell v. Mauzy* (N.D. Ill. 1981), 511 F. Supp. 729.

In arguing the memo should have been considered by the Board, the city argues, first, the Board was improperly exercising appellate functions in reversing a decision of the hearing officer which had permitted the introduction of the memo, and second, the memo was neither irrelevant nor hearsay as found by the Board.

We do not agree with the city that the Board lacks authority to make different evidentiary rulings than those made by its hearing officer. Indeed, in order to promote the efficiency of the system, the hearing officer should permit the introduction of evidence which is arguably proper so that a final decision can be made by the ultimate decision-making authority, the Board, without the necessity of referring the issues back to the hearing officer for further hearings if the same can be avoided. No authority has been cited, and on principle we doubt there is any, which holds that the hearing officer's determination on evidentiary issues is conclusive.

We do believe the Board erred in declining to consider the memo in this case, as we believe it is neither hearsay nor irrelevant. The ex-

hibit was not presented for the purpose of proving the absence of violations or compliance with the regulations and permit requirements but rather to place in proper context the seriousness and the significance of the violations alleged to have occurred prior to 1981. (See *Tri-County Landfill Co. v. Pollution Control Board* (1976), 41 Ill. App. 3d 249, 353 N.E.2d 316. Recently, in *City of Moline v. Pollution Control Board* (1985), 133 Ill. App. 3d 431, we approved the admission of interagency documents as they related to the Agency's enforcement procedure and the responsiveness of the alleged violator.

The Agency has relied primarily on *Illinois Power Co. v. Pollution Control Board* (1981), 100 Ill. App. 3d 528, 426 N.E.2d 1258, and *Chmieleski v. Venture Stores, Inc.* (1982), 106 Ill. App. 3d 312, 436 N.E.2d 4. These cases are distinguishable on their facts and lack any principle of sufficient generality to include the exhibit involved in this case. In *Illinois Power*, a request was made to supplement the record by including parts of the conversation of the members of the Pollution Control Board occurring during their deliberations. Obviously the deliberative discussion of the Board members was not part of the record. In *Chmieleski*, the court held that the agent of an insurance company was not the agent of its insured and consequently admissions of the company's agent were not binding on the insured.

In this case, there is no question but that Podlewski was an agent of the IEPA, that the statement was made in the usual course of his duties and it did represent or have a substantial bearing on Agency policy. As applied to the facts of this case, it has particular relevance both because of the result reached, *i.e.*, revocation of permit and large fine, and the period of time which the Agency and the Board considered relevant when the complaint was filed.

■ This brings us to the city's next assignment of error regarding the lack of sufficient proof of alleged violations described in counts VII and VIII of the complaint.

Before discussing counts VII and VIII specifically, we note that section 21 of the Environmental Control Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1021) prohibits the open dumping of waste or refuse in violation of regulations established by the Board or in violation of conditions of permits. The violations which were charged in the complaint filed in this case identified the regulation by number as well as the condition of the permit and described the violation in terms of the regulation and permit.

Counts I, II and III recite violations of Regulations 305(a), (b) and (c) respectively. The violation of Regulation 305(a) described in count I refers to the failure to provide 6-inch cover at the end of each work-

ing day on the working face of the landfill. Count II refers to the requirement of 12 inches of intermediate cover where the area is not in active use but is not permanently closed. Count III describes the failure to provide final cover, over 2 feet of fill, over an area which is permanently no longer in use.

The reports of the inspectors as well as their testimony indicated that cover requirements as described in the first three counts were violated on practically every occasion when they visited the landfill site. The reports and testimony generally covered a period of nine years. The city's evidence did not seriously contradict that of the reports and testimony but attributed some of their problems to wet and cold weather. The city also sought to minimize the deficiencies in their conduct of the landfill, suggesting that so long as no one complained the operation of the landfill was adequate even though it could be improved.

The deficiencies in the cover requirements, which in fact are not significantly disputed by the city, have been summarized first because to a large extent they are related to many if not all of the other violations specified in the complaint.

Count IV charged a violation of Regulation 303(a), which prohibits dumping except at the toe or the bottom of the fill. According to the Board's order, there were reports or photographs of violations of this requirement occurring on 12 dates commencing June 1975 through April 1980. More will be said about this count later.

Count V alleged a violation of Regulation 303(b) and in particular the failure to spread and compact refuse. This violation is somewhat related to the one charged in count IV because refuse not deposited at the toe of the fill could not be compacted and spread as effectively. Compaction requires that the layers be no thicker than 2 feet. Again, this violation is also related to inadequate cover, since if the cover requirements had been followed, the compaction and spreading requirements would probably have also been followed.

Count VI charges that the city, in violation of Regulation 306, failed to cover or store, in a closed container on a daily basis, litter. The Board found violations of its regulations occurring at least 17 times between October 1973 and March 1982.

This brings us to counts VII and VIII, which the city specifically argues were not proved by sufficient evidence and the Board's finding of violations are against the manifest weight of the evidence.

Count VII charges failure to provide measures to control leachate in violation of Regulation 314(e), and count VIII charges a failure to adopt measures to control vectors (agents such as animals or insects

capable of transmitting pathogens) in violation of Regulation 314(f).

There was testimony from inspectors, reports and photographs that leachate or leachate streams had originated from the fill area escaping onto the ground. When this happened, according to the city, the leachate was diverted and covered. Other evidence indicated the presence of dogs, birds and flies in substantial numbers feeding on the refuse. According to the Board, there were observances of leachate 14 times, the last occurrence being in September 1980. Observation of vectors occurred as late as April 1982.

We believe there is ample evidence to support the Board's finding that the violations alleged in counts VII and VIII were proved, and again these violations are associated with the failure of the city to provide the required cover.

Count IX alleges the city improperly handled sewage treatment sludge from 1974 until 1980, while count X alleged the unauthorized construction and improper use of trenches in which the sludge was deposited during the same period of time.

From the evidence, it appears that in 1974 the city received a supplemental permit to accept sewage treatment sludge originating in its own treatment plant as well as from other plants. This permit authorized the city to accept the sludge provided that it was mixed with an equal volume of ordinary refuse and handled in the same way as ordinary refuse. However, the city, rather than mixing the sludge, constructed trenches and deposited the sludge in the trenches but without adequate cover and without adequate means of handling the excess water content of the sludge. Leachate pools were observed originating from the sludge deposited in the trenches. In 1980 and thereafter, the city obtained permits for the use of trenches for sludge disposal. The permit for such use issued in 1980 was applied for in November 1978, and the record reveals extensive correspondence, including requests by both the city and the Agency for further information. From the dealings between the Agency and the city, it does not appear that either had any particular concern for the problem or the existing violations or any expression of the need for decisive action.

Count XI alleges the city accepted baled refuse without having a permit to do so in violation of Regulation 210. From the evidence, it appears the city did accept baled refuse from July 1981 until April 1982. Large bales of compacted refuse were stacked with little cover. The bales partially disintegrated resulting in partial dispersal of the refuse. The city was aware that a permit was required and applied for such a permit. However, the city continued to receive and accept bales until the permit was denied in April 1982, when the practice

was discontinued.

Although counts VII and VIII, dealing with control of leachate and vectors, are the only two counts which the city argues were not proved by sufficient evidence, we believe they were. Since these conditions do not occur in isolation, we have summarized the other counts of the complaint and discussed the supporting evidence relative to other violations so that our approval of the Board's finding of violations of counts VII and VIII can be more easily understood. This brings us to the city's last assignment of error, which is that the penalty is excessive and is an abuse of the Board's discretion.

The first argument of the city is that the issues are moot because all of the violations had been remedied before the complaint was filed. On the other hand, the Board argues there is no general rule precluding the assessment of a penalty merely because the violation has ceased prior to the commencement of enforcement proceedings.

■ The principal reason for authorizing the imposition of civil penalties is to provide a method to aid in the enforcement of the Act and punitive considerations are secondary. If compliance with proper environmental practices is the primary purpose for imposing civil penalties, then prohibited practices long discontinued are not an appropriate basis for the assessment of civil penalties. This does not mean that cessation of the violation before the enforcement proceeding commences should bar the assessment of a penalty if such penalty is related to compliance with the Act.

Where previous conduct constituting environmental violations has been discontinued, penalties assessed by the Board have been reversed in such cases as *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406, *Bresler Ice Cream Co. v. Pollution Control Board* (1974), 21 Ill. App. 3d 560, 315 N.E.2d 619, *Chicago Magnesium Casting Co. v. Pollution Control Board* (1974), 22 Ill. App. 3d 489, 317 N.E.2d 689, and *CPC International, Inc. v. Pollution Control Board* (1974), 24 Ill. App. 3d 203, 321 N.E.2d 58. A review of the aforementioned cases reveals a pattern indicating the relationship of the enforcement proceeding and the discontinuance of the violation. The longer the time period, the lapse between cessation of the violation and commencement of the enforcement proceeding, the more likely such enforcement proceeding is apt to be considered punitive only, having no relation to securing compliance with the Act.

When the evidence is viewed as it was considered by the Board, certain evidence or aspects of the evidence do not support the imposition of a penalty. First of all, the findings of the Board detail viola-

tions occurring between 1973 and 1982, with most of the evidence of violations pertaining to the period prior to 1981. There is no indication from the findings of the Board that it found the older violations any less significant then the later violations, even though the Agency itself neither found the earlier violations of sufficient importance to commence enforcement proceedings nor as late as 1981 believed that the previous violations were of sufficient seriousness to support the denial of additional permits. In the seventies, enforcement of the provisions of the Environmental Control Act regarding sanitary landfills did not receive high priority, and it has been only in recent years that landfill problems have received more attention. The inaction of the Agency regarding the operation of this landfill prior to 1980 represents an accommodation to and an acceptance of an inappropriate level of compliance which can not now be characterized as bad faith.

In the second place, at least three counts of the complaint, counts IV, IX and X, represent violations which later became nonviolations because permits were issued covering the conduct. For example, count IV, charging failure to deposit refuse at the toe of the fill, was authorized in September 1982, and according to the order of the Board no violation of this requirement had occurred subsequent to April 1980. Again, the prohibitions involving sludge became permitted operations after 1980, at least to the extent that disposal in trenches, the violation alleged, is concerned. We fail to see in what manner the assessment of penalties for such distant violations permitted at the time the complaint was filed is warranted.

However, not all of the violations or the supporting evidence related to incidents long passed but did apply to conditions existing at the time the enforcement proceedings were instituted. These violations involved inadequate cover or conditions stemming from or relating to inadequate cover, and the assessment of a penalty might well promote compliance with the violated sections of the regulations.

■ We believe the Board did consider the factors required by section 33(c) of the Environmental Control Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1033(c)) but did so in the context of considering as significant violations having no significance in the assessment of civil penalties. The violations which did exist or which were relevant to the issue of the imposition of civil penalties do not warrant the revocation of the city's permits and do not justify the amount of the penalty imposed.

For the foregoing reasons, the order of the Pollution Control Board revoking the permits of the city of East Moline is vacated and the monetary penalty of $30,000 is reduced to $10,000, and as so

modified the penalty and other provisions of the Board's order are affirmed.

Vacated in part, modified in part, affirmed in part.

HEIPLE, P.J., and SCOTT, J., concur.