MODINE MANUFACTURING COMPANY, Appellant, v. POLLUTION CONTROL BOARD *et al.*, Appellees.

Second District   No. 2—89—0441

Opinion filed February 1, 1990.

Roy M. Harsch, Daniel F. O'Connell, and Lisa Marie Anderson, all of

Gardner, Carton & Douglas, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Patricia E. Collins, Michelle D. Jordan, and Matthew J. Dunn, Assistant Attorneys General, of Chicago, of counsel), for respondent Environmental Protection Agency.

Dorothy M. Gunn, of Pollution Control Board, of Chicago, for respondent Pollution Control Board.

JUSTICE REINHARD delivered the opinion of the court:

Modine Manufacturing Company (Modine) petitions for review of an order of the Pollution Control Board (PCB) in an action instituted by the Environmental Protection Agency (EPA), in which the PCB imposed a $10,000 civil penalty against Modine for operating a facility without a permit in violation of section 9(b) of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1987, ch. 111½, par. 1009(b)).

The only issue presented for review is whether the $10,000 penalty was necessary to aid in the enforcement of the Act.

The record of the proceedings below establishes the following facts. Modine is engaged in the manufacture of aluminum air-conditioning condensers and evaporators for use in motor vehicles and operates a plant near Ringwood, Illinois, in McHenry County. Prior to January 24, 1986, Modine used a process known as "Alfuse" in the production of evaporators to bond fins to unassembled evaporator cores. The process involves applying a bonding slurry to the parts and curing the bond in an evaporator oven. The oven is a source of particulate emissions which pass through a venturi scrubber before being emitted out of a stack.

On December 15, 1981, a test of emissions from the evaporator production line revealed emissions in excess of the limit provided for by applicable regulations. On March 22, 1982, Sudhir Desai, an employee of the EPA, mailed a letter to Modine requesting it to submit a plan for compliance with emissions regulations. On April 15, 1982, Modine responded that it had retained a consultant to evaluate the problem and would implement his recommendations.

The consultant, David Rimberg, of North American Pemco, Inc., prepared a report making specific recommendations including adjustment of the liquid-to-gas ratio in the scrubber system. Modine made the suggested adjustments. On August 2, 1982, Modine applied for renewal of its permit to operate the condenser and evaporator production lines. On September 21, 1982, the EPA issued a renewal permit

scheduled to expire on October 31, 1983. A condition of this permit was that a stack test be conducted within 180 days of its issuance.

Modine performed a stack test on January 11, 1983, which indicated emissions below the limit. Modine reported this result to the EPA and indicated that it would conduct additional tests for verification. These tests, conducted in February and April 1983, showed particulate emissions in excess of the limit. Modine informed the EPA of the results of those tests. On June 23, 1983, the EPA notified Modine that it was in violation of emission regulations and could be subject to an enforcement action. A preenforcement conference was held on July 21, 1983, at which Modine outlined specific steps to decrease emissions, including installation of a new fan in the scrubber.

Prior to the preenforcement conference, Modine applied to the EPA for renewal of its operating permit. On August 3, 1983, the application was denied. Modine then submitted another permit application for the evaporator production line only. This application was also denied.

Throughout the period following the preenforcement conference, Modine informed the EPA of its progress in installing the new fan. Due to weather delays, the fan was not installed until January 1984. The total cost of installing the fan was $22,000. Despite the installation of the fan, a stack test conducted in March 1984 showed excess emissions. Modine again consulted with Pemco, which suggested certain adjustments. A second preenforcement conference was held on June 25, 1985. At this conference, Modine submitted a compliance plan which incorporated Pemco's recommendations. Modine attempted to implement the recommendations, although a suggested adjustment of the scrubber's liquid-to-gas ratio caused the system to shake severely. Modine kept the EPA apprised of its progress. Stack tests conducted in March 1985 still showed noncompliance.

During this time, Modine was considering several options for achieving compliance and ultimately decided to replace the Alfuse process with the Nocolok process. In February 1985, Modine purchased a technology transfer and licensing agreement from Nocolok for $310,000.

On June 26, 1985, a conference was attended by representatives of Modine and the EPA. Modine discussed its plans to replace the Alfuse process. The EPA agreed to accept this as a compliance plan and refrain from bringing an enforcement action against Modine for particulate air emission violations.

Modine discontinued use of the Alfuse process in late January 1986. On February 25, 1986, the EPA filed a two-count complaint

with the PCB. Count I alleged operation of the evaporator production line without a permit from October 31, 1983. Count II alleged violation of particulate emission limitations. The PCB found both violations to have occurred and imposed a $10,000 penalty on Modine.

Modine petitioned for review of the PCB order directly to this court, asserting that the EPA's agreement not to institute enforcement proceedings barred the instant action. Modine also asserted that the PCB erred in imposing a $10,000 penalty because no penalty was necessary to enforce the Act. This court held in *Modine Manufacturing Co. v. Pollution Control Board* (1988), 176 Ill. App. 3d 1172 (unpublished order under Supreme Court Rule 23), that the EPA had agreed not to pursue enforcement based on emissions violations but that no such agreement existed with respect to permit violations. This court remanded to the PCB for determination of an appropriate penalty based solely on the permit violation. This court declined to address the propriety of the penalty imposed. On remand, the PCB imposed a $10,000 fine based on the permit violation. Modine again seeks direct review of this order in this court pursuant to section 41 of the Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1041).

Modine contends that the PCB erred in imposing a $10,000 penalty because the penalty was not necessary to aid in the enforcement of the Act, but rather was imposed solely for punitive reasons. Respondents maintain that the penalty imposed reflects proper consideration of applicable statutory factors and was not an abuse of discretion.

Section 33(b) of the Act provides that in enforcement actions the final order of the PCB "may include a direction to cease and desist from violations of the Act or of the Board's rules and regulations or of any permit or term or condition thereof, and/or the imposition by the Board of civil penalties in accord with Section 42 of this Act." (Ill. Rev. Stat. 1987, ch. 111½, par. 1033(b).) Section 42 provides for a civil penalty not to exceed $10,000 for each violation and an additional penalty not to exceed $1,000 for each day during which the violation continues. (Ill. Rev. Stat. 1987, ch. 111½, par. 1042.) The legislature has vested the PCB with broad discretionary powers in the imposition of civil penalties, and its order will not be disturbed upon review unless it is clearly arbitrary, capricious or unreasonable. *City of Freeport v. Pollution Control Board* (1989), 187 Ill. App. 3d 745, 750, 544 N.E.2d 1.

Nonetheless, it is well established that the Act does not confer upon the PCB the authority to impose a civil penalty in every case of a violation of the Act or regulations. (*Metropolitan Sanitary Dis-*

*trict v. Pollution Control Board* (1975), 62 Ill. 2d 38, 45, 338 N.E.2d 392; *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 208, 326 N.E.2d 406.) The principal reason for the imposition of civil penalties under the Act is to provide a method to aid in its enforcement; punitive considerations are secondary. *Metropolitan Sanitary District*, 62 Ill. 2d at 45, 338 N.E.2d at 397; *Trilla Steel Drum Corp. v. Pollution Control Board* (1989), 180 Ill. App. 3d 1010, 1013, 536 N.E.2d 788.

■ Initially, Modine contends that imposition of a penalty here would not aid in the enforcement of the Act because it was no longer in violation of the Act at the time the complaint was filed. While there is arguably some support for this view (see *City of Moline v. Pollution Control Board* (1985), 133 Ill. App. 3d 431, 434, 478 N.E.2d 906; *Chicago Magnesium Casting Co. v. Pollution Control Board* (1974), 22 Ill. App. 3d 489, 495, 317 N.E.2d 689), we believe all the relevant facts and circumstances must be examined to determine if a civil penalty is to be imposed as a method to aid in the enforcement of the Act. Thus, we decline to hold categorically that penalties may not be imposed for wholly past violations. (See *City of East Moline v. Pollution Control Board* (1985), 136 Ill. App. 3d 687, 693, 483 N.E.2d 642.)[1] Nonetheless, as we explain below, we do not believe the record supports the penalty imposed here.

■ In making its determination as to whether a penalty is warranted and, if so, the amount of the penalty, the PCB must consider all facts and circumstances bearing upon the reasonableness of the complained-of conduct, including, but not limited to, certain factors specified in section 33(c) of the Act. (Ill. Rev. Stat. 1985, ch. 111½, par. 1033(c); *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 208-09, 326 N.E.2d 406.) The statutory factors in effect at the time the complaint was filed were:

"(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

---

[1]As the EPA and the PCB note, since this action was instituted, section 33(a) has been amended and now expressly provides that "It shall not be a defense to findings of violations *** or a bar to the assessment of civil penalties that the person has come into compliance subsequent to the violation." Ill. Rev. Stat., 1988 Supp., ch. 111½, par. 1033(a).

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source." (Ill. Rev. Stat. 1985, ch. 111½, par. 1033(c).)

Moreover, the severity of the penalty should bear some relationship to the seriousness of the infraction or conduct. (*Southern Illinois Asphalt Co.*, 60 Ill. 2d at 208, 326 N.E.2d at 408.) Additionally, good faith or lack thereof is pertinent to the issue of whether a penalty should be imposed and, if so, the amount of the penalty. *Archer Daniels Midland v. Pollution Control Board* (1986), 149 Ill. App. 3d 301, 305, 500 N.E.2d 580; *Standard Scrap Metal Co. v. Pollution Control Board* (1986), 142 Ill. App. 3d 655, 662, 491 N.E.2d 1251; see also *City of Chicago v. Pollution Control Board* (1978), 57 Ill. App. 3d 517, 521, 373 N.E.2d 512.

■ Applying these principles to the instant case, we note that with respect to the first statutory factor, the PCB found that "[t]he Board does consider that the degree of interference with the public health, welfare or property is considerable for operating without a permit. *** When a permit program is established, each permit and its contents become a first line mechanism by which the requirements of the Act and related Board regulations are effectuated, facility by facility." Application of this rationale to the facts of the instant case is undercut by the recent decision of the Appellate Court for the First District in *Trilla Steel Drum Corp. v. Pollution Control Board* (1989), 180 Ill. App. 3d 1010, 536 N.E.2d 788. In that case, the court stated:

"The record reveals that the penalty was imposed due to Trilla's failure to obtain an operating permit for a period of 15 months. During that time, however, Trilla was not entirely beyond the regulatory awareness of the Agency since prior to the end of 1984 Trilla had applied for and received an operating permit. Further, in January 1986, Trilla had applied for and received a variance from the Agency. By Trilla's permit and variance applications, the company became a part of the regulatory program of the Agency and the Agency had data concerning the company's existence, the products it manufactured and the contaminants which were emitted by the operation. The Board has not shown that Trilla's omission has harmed in a serious manner either the information gathering or oversight roles of the Agency." 180 Ill. App. 3d at 1013, 536 N.E.2d at 790.

Similarly, in the instant case, Modine was not beyond the regulatory awareness of the EPA. Modine had initially operated with a permit, applied for a renewal permit, and conducted tests of its facilities

and apprised the EPA of the results. The EPA and the PCB note that in *Trilla* the petitioner had applied for and received a variance, whereas Modine never sought a variance. We find this distinction to be of no consequence. Modine became part of the regulatory program, the EPA had information about its operations, and the EPA voluntarily withheld enforcement procedures while working with Modine to achieve compliance.

As to the remaining statutory factors, the PCB found that, aside from its operation without a permit, Modine's operations were of significant social and economic value. This finding is amply supported by the record. The PCB found that the third factor, suitability of the pollution source to its location, was of little relevance to a case involving a permit violation.

As to the final factor, the technical practicability and economic reasonableness of reducing or eliminating emissions, the PCB found that even though time may have been a limiting factor in implementing a reduction mechanism, the PCB would not consider the factor in a light favorable to Modine because Modine never applied for a variance. We fail to see how this procedural consideration is relevant to the question of technical practicability and economic reasonableness. In any event, it appears from the record that Modine did not anticipate the difficulty it would encounter in achieving compliance. Modine's decision to concentrate its efforts and resources on achieving compliance, rather than obtaining a variance, is largely excusable in these circumstances.

Moreover, it is apparent from the record that Modine acted in good faith throughout the relevant time period. Modine was candid and cooperative with the EPA. Additionally, Modine made a sincere effort and expended substantial sums of money to remedy the problem.

Under all these circumstances, we find that imposition of the maximum penalty of $10,000 for this violation is not supported by the record, even considering the PCB's argument that the statute allows for an additional penalty not to exceed $1,000 for each day the violation continues. Imposition of the maximum penalty is not commensurate with the severity of the violation and would not aid in the enforcement of the Act. We note that we are empowered to determine an appropriate penalty and need not remand to the PCB for a new determination. (*Archer Daniels Midland v. Pollution Control Board* (1986), 149 Ill. App. 3d 301, 306, 500 N.E.2d 580.) We have reviewed the record and determine that a penalty of $1,000 is warranted, and the order of the PCB is so modified.

For the foregoing reasons the order of the PCB is affirmed as modified.

Affirmed as modified.

UNVERZAGT, P.J., and McLAREN, J., concur.