ARCHER DANIELS MIDLAND COMPANY, Petitioner, *v.* THE POLLU-
TION CONTROL BOARD *et al.*, Respondents.

Fourth District   No. 4—83—0297

Opinion filed November 16, 1983.

Wayne L. Bickes, of Rosenberg, Rosenberg, Bickes, Johnson & Richardson, Chartered, of Decatur, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Vincent W. Moreth, Assistant Attorney General, of counsel), for respondents.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

Petitioner, Archer Daniels Midland Corporation (ADM), appeals from an order of the respondent, Illinois Pollution Control Board (Board), which found it to be in violation of certain provisions of the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, par. 1001 *et seq.*) and of regulations promulgated thereunder. The Board imposed a fine of $40,000.

The case proceeded on a complaint of the Illinois Environmental Protection Agency (EPA), which, after amendments, contained seven counts, all of which related to ADM's discharge of contaminated storm water. Process waste water is not involved. All of the alleged violations stemmed from what in the record is called ADM's West Plant.

The ADM West Plant is located in the far northeastern section of Decatur and is located upon approximately 25 acres of land. The facility is a soybean extraction plant, a corn germ extraction plant, and a vegetable oil refinery. Products manufactured there include soybean oil, soybean meal, corn germ meal, and corn oil.

A small stream meanders from the area of the West Plant into Lake Decatur, the municipal reservoir of that city, which is about two miles south of the plant. At its southern terminus just before emptying into Lake Decatur the stream has been dammed to create what is called Homewood Fishing Club Lake, an artificial body of water covering about two acres to a depth of five to six feet. The Homewood Fishing Club was incorporated in 1914 and about 16 residences have

been erected around its lake. The record discloses that approximately 30 persons lived there at the time of the hearing. The area between the ADM West Plant and the Homewood Fishing Club is heavy industrial, containing among other things railroad rights of way, railroad switching yards, and a public high school. It is the contamination of this stream and the Homewood Fishing Club Lake which is at issue here.

The complaint alleged that on six named occasions, July 20, 1975; June 20, 1978; June 30, 1978; July 1, 1979; January 7, 1979; and July 28, 1979, ADM permitted effluents from its West Plant to be discharged into the stream thus contaminating the Homewood Fishing Club Lake; other allegations were that a fish kill had occurred as a result of the contamination for which the Board ultimately charged ADM $1,008; and that at various times during the period involved, the last being between April 10, 1981, and September 20, 1981, ADM had violated the provisions of its National Pollutant Discharge Elimination System (NPDES) permit.

In the record ADM did not seriously contest the violations; rather it contended that they were the result of accidents, that the pollution came from the intervening territory between it and the Homewood Fishing Club Lake, and that no feasible solution to its problem existed.

As has been indicated, only storm water is involved in this case. ADM's storm water becomes contaminated when rain flushes spilled raw grain or processed grain products into its storm water collection system.

Several witnesses explained how ADM's storm water collection system operated. Rainfall is collected at the West Plant by storm sewers located in various areas throughout the plant, which themselves hold 300,000 gallons. In 1975, flow from these sewers entered a wet well containing multiple pumps. In dry weather, flow to the wet well was pumped to a process water treatment facility. Following treatment, flow from the process water treatment facility discharged into the system of the Sanitary District of Decatur. In wet weather, storm water was pumped to a 200,000 gallon tank referred to as a storm water clarifier. The tank was originally designed to clarify the water that it held. Overflow from the clarifier would discharge into the Homewood tributary. This system did not operate according to design, and the function of the clarifier was changed to that of a retention tank in 1976. A "first flush" system was then employed. The first water to drain from the plant during a rain is generally the most polluted. Under the first flush system, the clarifier retains as much of

this initial storm water as its capacity will allow. The collected water is then discharged to the process water treatment system. Whenever overflow or bypassing of the storm water clarifier occurs, the water is discharged into the Homewood tributary. A one-inch rain was estimated to generate approximately 700,000 gallons of storm water run-off.

In 1975, ADM's West Plant was issued its first NPDES permit for discharge of contaminated storm water. The NPDES permit included a schedule for compliance calling for construction of facilities to achieve compliance with effluent limitations by June 30, 1977. On June 18,1980, the EPA reissued an NPDES permit for the West Plant with an effective date of July 18, 1980. Effluent limitations and monitoring conditions for discharging contaminated storm water were specified in the reissued NPDES permit. pH was to be maintained between 6.0 and 9.0. Limitations were placed upon various contaminants including Biochemical Oxygen Demand (BOD), suspended solids, and oil and grease. Monitoring results were required to be recorded by ADM on separate monthly Discharge Monitoring Reports and submitted quarterly to the EPA.

BOD is a measure of the oxygen removal effect that decaying organic matter has on water. Organic material such as soybean meal and soybean oil is high in BOD and has an adverse effect on water quality as it decomposes. Bacteria in the water respond to organic matter by utilizing it as a food source. When excessive amounts of organic matter are present in the water, the bacteria utilize oxygen at a rapid rate as they feed, depleting or even eliminating the oxygen supply available for other aquatic life.

ADM conceded that on five separate instances it discharged contaminated effluent into the Homewood tributary.

On July 20, 1975, the clarifier tank overflowed for several hours as a result of a 2½ inch to 3 inch rainfall. After this incident ADM employed its first flush system.

On June 22, 1978, the first flush of a heavy rain drained directly into the Homewood tributary. ADM was in the process of installing larger and more efficient pumps to the holding tank at the time the rain began. As a result, none of the initial water was pumped into the holding tank.

On January 7, 1979, the pumps to the holding tank failed; water standing in the lines to the pumps froze. The level of contaminated water in the holding tank rose and a discharge of effluent resulted. After the incident, ADM devised a method of draining the lines to the pumps so that water would not freeze there.

On July 28, 1979, the clarifier holding tank overflowed during a heavy rain. An employee failed to shut off the pump when the holding tank had filled. The material floating at the top of the tank is the most highly contaminated of the retained water. It was this water that flowed into the Homewood tributary. An automatic shut-off system was installed after this discharge.

Another incident occurred on June 26, 1981. The holding tank was being emptied into the process water treatment tank and the debris and materials at the bottom of the holding tank were being cleaned out. A discharge hose was run from the bottom of the tank into a drain that was thought to lead to the process water treatment facility. Instead, the drain emptied into the storm water system which, in turn, flowed into the Homewood tributary. The drain was later filled with concrete so as to avoid repetition of a similar incident.

In addition, letters from ADM to the EPA showed that on July 3, 1976; July 19, 1976; January 11, 1977; May 4 through 6, 1977; June 10, 1978; June 30, 1978; and July 1, 1978, ADM allowed discharges of contaminated storm water from their holding tank to occur. Each letter was sent by ADM notifying the EPA of a bypass. ADM's own discharge monitoring reports (DMRs) for the months of August 1980 through September 1981 established that ADM had on numerous occasions discharged contaminated effluent which exceeded permitted levels of pollution.

Other witnesses testified as to the fish kills in the Homewood Lake. There were three occasions, and in each instance there was an oily scum on the surface of the lake similar in appearance to that in ADM's holding tank. On one occasion even the hardiest of species, black bullheads, perished.

The complainant EPA also produced as witnesses two current and one past property owners living upstream from the lake but downstream from ADM. All of them testified with varying degrees of vehemence as to their displeasure and anger with the condition of the lake and the stream.

ADM presented extensive evidence concerning its environmental efforts; these included concreting of areas for easier cleaning, installation of dust collecting systems, installing large pumps for the holding tank, enclosing the transfer systems between elevators; the total expenditures over the five or six years preceding the hearing were in the neighborhood of $4,500,000.

Of particular significace to our disposition regarding this case is the testimony of ADM's West Plant manager, who told of a meeting

held among ADM personnel, legal counsel for the EPA, and members of the EPA staff. According to the manager, it was recommended that ADM employ an outside engineering firm to make a study of their environmental problems. Thereafter, such a firm, Clark-Dietz, was engaged, and it recommended that a larger holding tank with a 600,000 gallon capacity be constructed. However, it cautioned that even with such capacity, a large enough rain would cause it to overflow and the same problem as now existed would recur. The estimated cost of the larger tank was $600,000.

An ADM vice president testified that the company knew of no engineering solution to the problem of heavy rains, but if one were found, the company stood ready to spend upwards of $1,000,000 to solve it.

It was also made a part of the record that ADM had the capacity to pump all of its storm water into the system of the Decatur Sanitary District, but that it is limited by the District as to how much storm water may be diverted into its system. In addition, substantial evidence was produced showing that ADM plays a significant role in central Illinois' social, cultural, and economic life and that there is no other suitable location for the West Plant, which is located in conformity with local zoning ordinances.

The record also demonstrates that both parties indulged in considerable legal omphaloskepsis. The Board attempted to show possible pollution of Lake Decatur, but its only evidence of this was the observation of a local airplane pilot who once observed an oil slick on Lake Decatur which appeared to have its origin in the Homewood Fishing Club Lake. No evidence or complaint was received or heard from the Decatur authorities. ADM presented much testimony which pointed the finger at grain spills on the railroad rights-of-way which exist between it and Homewood and at a local high school also located in that area. However, other evidence indicated that all grain spills on the railroad were promptly cleaned up by it and in any event the drainage on the railroad and its switching yards is in another direction. No sensible theory was offered regarding the high school.

James Levis, the research economist for the EPA, testified that he had made a calculation concerning the amount of money that a company saved by "late compliance" with environmental standards. The calculation was made using the United States Environmental Protection Agency's "Noncompliance Penalty Formula." Levis testified that he had been given a $600,000 figure as the capital cost which had been delayed. This figure represented the amount of money ADM estimated it would cost to install the 600,000 gallon holding

tank. He then made a calculation using financial data from ADM, and he estimated the useful life of the equipment at 20 years. Levis stated that he made two calculations. One calculating the savings for ADM from August 1975 to present. The other estimating their savings from July 1977 through the present for the late expenditure of the $600,000. The 1975 calculation showed a savings to the company of $108,089.70, and the 1977 calculation showed a savings of $53,233.76. Levis testified that the formula was complicated and the calculations were made by computer. Levis was of the opinion that calculations based upon the formula accurately reflected the amount of money a corporation saved by delaying capital expenditures for necessary environmental improvements.

As has been indicated, the Board issued an order finding that ADM was in violation and imposing a fine of $40,000. One member of the Board concurred specially, believing that the fine should have been $50,000. On appeal ADM raises two issues: (1) that the Board's findings were against the manifest weight of the evidence, and (2) that the fine was arbitrary and unsupported by the evidence.

As to the first issue, it appears to be endemic in these pollution cases that vast quantities of evidence are introduced at the hearing, much of it cumulative and uncontroverted. Such is the case here. We have carefully examined the hearing record and have attempted to point out the salient elements in our recitation of the facts. We observe generally for the guidance of hearing officers in these cases that the "weight" of the evidence refers to its quality, not its quantity.

■ It is fundamental that a reviewing court may not overturn a decision of the Board unless it is found to be against the manifest weight of the evidence. *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406; *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161.

■ As has already been said, ADM did not seriously contest the violations, but readily admitted that on five occasions it discharged contaminated effluent, and its own discharge monitoring reports established numerous other violations of its permit. It argues that the five violations were the result of human and mechanical error. This may offer a reason for the violations, but it is not tantamount to an excuse. At most, the reasons are significant only to the extent that they influenced the Board in its application of a civil penalty.

■ As to the argument that the pollution found its source in the intervening territory, we find it completely without merit. The evi-

dence was clear that any grain spills on the railroad were at times different from the violations alleged in the complaint, and there was further evidence that they were all promptly cleaned up. Furthermore, there was testimony from railroad personnel that the drainage on their right-of-way and nearby switchyard was in a direction away from the stream feeding the Homewood Fishing Club Lake.

ADM's principal argument is that no technology exists by which the problem can be cured and points to the testimony regarding the Clark-Dietz report. As a preliminary matter, the Board now objects that this testimony was hearsay. The objection is without merit. It was developed by the Board in its examination of ADM's plant manager. The Board cannot now complain about an evidentiary error which it itself generated.

■■ ■ However, ADM cannot avail itself of the same error. Under section 31(c) of the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, par. 1031(c)), once the EPA has made a *prima facie* case of violation, the burden shifts to the respondent to show that compliance would pose an arbitrary or unreasonable hardship. ADM did not carry this burden. It presented no expert evidence even though it was faced with an engineering problem. While the Board cannot complaint about the admission of the testimony regarding the Clark-Deitz report, it is not required to accept it.

This case differs in this respect from *Metropolitan Sanitary District v. Pollution Control Board* (1975), 62 Ill. 2d 38, 338 N.E.2d 392, relied upon by ADM. In that case the District was fined $1,000 for pollution caused while a trickling water filter seal was being replaced. The supreme court vacated the fine because there was no evidence in the record to rebut the contention that there was no practical or economically feasible way to eliminate the problem. The District presented the testimony of its chief of maintenance and operations that while the seal was being replaced, the filter has to be shut down, and any alternate means of treating the effluent were impractical. No such expert testimony exists in the record in the instant case.

■■ Moreover, the record demonstrates affirmatively that the Decatur Sanitary District could treat ADM's effluent if ADM were permitted to discharge it into the District's system. If the District can treat it, it must be treatable, as the Board found. All that the record shows in ADM's favor in this context is that it was unaware of an alternative solution. It thus fell short of proving that compliance would impose an arbitrary or unreasonable hardship.

In a variety of other instances ADM argues that the Board ignored mitigating factors. The evidence was conflicting in nearly every

instance and was resolved against ADM and in favor of EPA and after examination of each, we cannot say that the Board was in error. One deserves brief comment. It was apparent that only about 30 persons were directly affected by the violations. By commenting on this, the Board seems to admit that the violations do not spell the crack of doom for western civilization. However, it then proceeds to speculate without any foundation other than the observation of the pilot, who also was a resident in the Homewood Fishing Club, that the violations might or could affect a larger number of people, *viz*, those taking their water from Lake Decatur. Such bootstrapping scarcely builds confidence in the Board as an impartial public agency.

In our opinion the findings of the Board are not against the manifest weight of the evidence. We cannot say the same about the imposition of the fine nor its amount.

It is abundantly clear that the Board relied on Levis' testimony in assessing the fine and that testimony is based on several spurious assumptions. In addition, there was no foundation for other portions of it.

First, he used a figure of $600,000 as the prime base for calculations. Notwithstanding the fact that the Board itself has objected to that figure in this court, it is a fictitious one. It represents money not spent on something which would not solve the problem—it represents an absence of evidence, not the presence of evidence of what it would cost to correct the violations.

Furthermore, Levis testified that he assigned a 20-year useful life to the fictitious tank and admitted that he pulled this figure "out of the air," and that a different useful life figure would have yielded a different result.

Of significance also is the fact that Levis testified that his formula was so complex that he could not explain it and that at least a portion of it was generated by a computer. He did not present the computer data upon which the machine performed its calculations nor attempt to explain the computer's result. This subject has been dealt with in *Grand Liquor Co. v. Department of Revenue* (1977), 67 Ill. 2d 195, 367 N.E.2d 1238, and *Puleo v. Department of Revenue* (1983), 117 Ill. App. 3d 260, 453 N.E.2d 48. The rationale of those cases is that when computer evidence is introduced, some explanation of it is in order so that the opposing party may cross-examine to determine whether the garbage-in-garbage-out syndrome applies.

■ The Board argues that there are other portions of the Environmental Protection Act which would sustain such a fine. The brief answer is that those sections were not considered in arriving at the

$40,000 figure, which is said to be ADM's savings by not installing the $600,000 tank. In the absence of any evidence of the nature and cost of a successful solution to ADM's problem, it is clear that ADM's purported savings cannot be calculated.

The Board also argues that the $40,000 is *de minimis* for a corporation of ADM's size and stature and at least twice in the course of its order recites ADM's over-all net profits. We are not aware of any authority which makes the ability to pay the proper basis for a civil penalty, and in the case of a multiplant corporation, it ignores any internal accounting system which might attribute the entire penalty to one profit center.

■ We will not be understood as saying that a penalty is, or is not, justified under the circumstances here present. That is the prerogative of the Board. What we do say is that the penalty here was assessed upon improper and incompetent evidence and must therefore be vacated.

By supplemental citation of authority the Board has called our attention to the recent case of *Wasteland, Inc. v. Pollution Control Board* (1983), 118 Ill. App. 3d 1041. In that case the appellate court upheld the imposition of a civil penalty based upon savings made by the violator. The court's opinion does not recite what evidence was received to substantiate the savings, stating only, "The figures for those substantial cost savings, as well as for the profits from site operations, were in the record." (118 Ill. App. 3d 1041, 1055.) Of greater significance, and what in our opinion distinguishes *Wasteland* from the instant case, is the court's emphasis in *Wasteland* of the violator's "continuing blatant disregard for requirements and procedures designed to protect the environment while permitting useful operations." (118 Ill. App. 3d 1041, 1055.) There is no such case here. Quite the opposite is true. The record clearly establishes that ADM has spent $4,500,000 for environmental improvements and stands ready to spend another $1,000,000 if a solution can be found.

■ The findings by the Board of the violations set forth in its order are affirmed. The penalty is vacated and the cause is remanded to the Board for another determination as to whether under all the circumstances present any penalty is justified; and if so, to calculate it in conformity with the views expressed in this opinion.

Affirmed in part, vacated in part, and remanded with directions.

MILLS and MILLER, JJ., concur.