THE CITY OF MOLINE, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Third District   No. 3—84—0663

Opinion filed May 17, 1985.

Larry Woodward, City Attorney, of Moline, and Richard J. Kissel, J.C. Fort, and Daniel F. O'Connell, all of Martin, Craig, Chester & Sonnenschein, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Anne Rapkin, Assistant Attorney General, of Chicago, of counsel), for appellees.

PRESIDING JUSTICE HEIPLE delivered the opinion of the court:

This action was commenced by the filing of a five-count complaint with the Pollution Control Board (the Board) by the Illinois Environmental Protection Agency (IEPA). The allegations arose from the operation by the city of Moline (Moline) of its North Slope Sewage Treatment Plant (North Slope). The complaint was subsequently amended to add three counts concerning the alleged dumping of sewer cleanings into a storm sewer by Moline employees. The Board found that Moline had violated section 12(a) of the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, par. 1012(a)), its National Pollutant Discharge Elimination System (NPDES) permit and various Board rules from April 1, 1979, through December 30, 1982. A fine of $90,000 was imposed along with an order to cease and desist from further violations. Moline appeals, admitting the existence of

violations, but challenging the imposition of a fine.

Up until 1978, Moline had operated North Slope as a primary treatment facility. In 1978, pursuant to a Federal grant, North Slope was upgraded to a secondary facility. In March 1979, the plant began receiving sludge from Moline's drinking-water treatment plant. During this time the plant was in the middle of mechanical difficulties with its newer equipment. It became immediately apparent that North Slope, as presently constituted, would not be able to transport enough sludge away to allow for proper treatment and mechanical functioning. In April, Moline applied for a grant amendment to purchase a second truck for sludge hauling. Arrangements were also made with the Rock Island Landfill to accept sludge after normal hours. These measures were thwarted when the IEPA closed the Rock Island Landfill and denied the grant amendment for the second truck. The changing of disposal sites caused immediate problems in that the new landfill had shorter hours and rougher access conditions than Rock Island. This caused increased truck breakdowns and greater turnaround time, which in turn created an increased strain on North Slope's ability to treat wastes efficiently. Consequently, equipment breakdowns occurred more frequently and a low quality effluent was produced. In fact, Moline consistently exceeded its permit limitations in all relevant categories.

On September 9, 1980, a meeting was held between representatives of Moline and the IEPA. It was clear to both sides that the inadequate handling and disposal of sludges was the major factor in North Slope's poor performance. The IEPA suggested that Moline apply for IEPA grant funds to finance improvements in the sludge-handling systems. Moline agreed and hired consulting engineers to prepare the application. At this time, the IEPA decided not to bring an enforcement action against Moline, as it felt that the steps being taken would serve the same essential purpose.[1]

With one minor delay, the grant-application procedure was on schedule. In December 1981, a facilities plan was submitted to IEPA for final approval. Throughout 1981, Moline made minor changes to improve sludge handling, but with little effect, as effluent quality remained poor.

In March 1982, with the plant virtually inoperative due to excess

---

[1]In considering the internal IEPA documents, we decline to follow the Board's ruling that documents detailing IEPA's enforcement decision process are irrelevant. In light of the defense raised by Moline, how and why the IEPA considered bringing North Slope into compliance is highly relevant in determining the propriety of Moline's responsive efforts.

sludge, Moline decided to take additional steps outside the grant process to alleviate the situation. A contract hauler was engaged to supplement sludge-handling capability. Moline's attorney determined that its landfill had the right to operate for longer periods. The operator of the landfill was persuaded to obtain expanded hours and did so.

These and the aforestated minor changes combined to bring about a marked improvement in the quality of North Slope's effluent. In May 1982, a meeting was held where the IEPA advised that these new measures should be continued and that monitoring would be continued to see if the plant's operation could be stabilized. With the exception of July, where the flow of sewage was especially high, North Slope was in substantial compliance with its permit.

In spite of the improvements shown, the IEPA informed Moline in September that the North Slope file was being referred to its legal staff for preparation of an enforcement action. The complaint was filed in December. There is nothing in the record to suggest that North Slope has been out of compliance since October 1982.

The Board found for the IEPA on counts I through IV and VI through VIII of its amended complaint. No sanctions were entered on the latter three counts, as the Board considered it an isolated incident which was properly dealt with by Moline. After weighing factors in aggravation and mitigation as required by section 33(c) of the Act (Ill. Rev. Stat. 1981, ch. 111½, par. 1033(c)), a fine of $90,000 was imposed. As we reverse the fine *in toto*, there is no need for a detailed analysis of the Board's conclusions.

■■ There is no question that Moline violated the Environmental Protection Act, its NPDES permit and various administrative standards. A fine should not necessarily be imposed once a violation has been found. (*Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 404, 326 N.E.2d 406.) It is only when a fine would aid in the enforcement of the Act that such a penalty should be imposed. Punitive considerations are secondary. *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161.

■■ There is no way a penalty in this case would aid in the enforcement of the Act. While the evidence produced before the Board reveals a seriously troubled and environmentally harmful operation at North Slope in its early years following upgrading, it is equally clear that these problems were substantially under control at the time the complaint was filed. The Board found that this was so because Moline only undertook remedial efforts "on the eve of enforcement." This conclusion is not supported by the manifest weight of the evidence. The Board has committed the common fallacy of *post*

*hoc, ergo propter hoc.* While North Slope's compliance coincided roughly with the threat of enforcement, the evidence is clear that the steps critical to the plant's improvement were instituted months before Moline was notified of the instant action.

The Board also took into consideration the fact that the measures eventually employed could have been effectuated much earlier to prevent additional pollution. This is basically true, but of little moment. The imposition of a fine for failure to take steps which were eventually taken prior to enforcement would be purely punitive.

Two significant facts dictate against the imposition of any mandatory penalty by the Board. First, the ends sought did not necessarily require the bringing of the instant complaint. In working with Moline to solve its problems, the IEPA chose an effective and appropriate course of action. Instead of jumping the gun in September 1980 and bringing an action against an obvious polluter, the IEPA took the prudent course of seeking alternative means to assure compliance. The maintaining of this course produced, if not with any great immediacy, the initially desired result. This was particularly appropriate, in that the IEPA was dealing with neither a wilful and callous pillager of the environment nor a private party for whom delayed compliance would translate into personal gain. Second, one must consider the identity of the respondent. The burden of the fine would be borne by the taxpayers of Moline. While the Board points out that the underassessment of these taxpayers was a contributing reason for Moline's noncompliance, it would serve no useful purpose to punish them further for the violations charged. It should also be noted that an increase by 165% in sewer assessments was necessary to finance the measures instituted by Moline.

Accordingly, the order of the Pollution Control Board imposing a $90,000 fine is reversed.

Reversed.

SCOTT and WOMBACHER, JJ., concur.