ESG WATTS, INC., Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Fourth District    No. 4—95—0642

Argued May 15, 1996.—Opinion filed June 28, 1996.

James M. Morphew and Charles J. Northrup (argued), both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for petitioner.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, Deborah L. Ahlstrand (argued), and Thomas E. Davis, Assistant Attorneys General, of counsel), for respondents.

PRESIDING JUSTICE COOK delivered the opinion of the court:

Petitioner ESG Watts, Inc., appeals the decision of the Pollution Control Board (Board) to impose a penalty of $60,000 for petitioner's failure to timely pay solid waste fees and to timely submit various reports required of landfill operators by the Environmental Protection Act (Act) (415 ILCS 5/1 *et seq.* (West 1992)) and regulations promulgated thereunder. *People v. Watts*, Ill. Pollution Control Bd. Op. 94—127 (May 4, 1995). Petitioner admits violating the Act, but contends the penalty was excessive because the violations caused no environmental harm and it is now in compliance with the Act. Petitioner further contends that the Board improperly considered its past violations when assessing the penalty. We disagree and affirm.

## I. BACKGROUND

Petitioner is a wholly owned subsidiary of Watts Trucking Service, Inc. (Watts Trucking). James Watts is the sole shareholder of Watts Trucking and the president of both companies. Petitioner owns and operates the Sangamon Valley Landfill (Sangamon Valley), which serves the City of Springfield and surrounding communities, and the Taylor Ridge Landfill (Taylor Ridge), which serves the Rock Island area.

On April 20, 1994, the State, acting through the Attorney General's office, filed a complaint before the Board against petitioner, Watts Trucking, and James Watts, alleging that fees and reports required of landfill operators were not timely made. On October 14, 1994, the State filed an amended complaint, which alleged additional delinquencies that occurred after the filing of the original complaint.

Section 22.15(b) of the Act provides that landfill operators are to pay certain fees (see 415 ILCS 5/22.15(b) (West 1992)), and Board rules provide that "[p]ayment of the fee due under Section 22.15 of the Act shall be made on a quarterly basis with the submission of the Quarterly Solid Waste Summary" (35 Ill. Adm. Code §858.401(a) (1994)). Count I of the amended complaint alleged that the quarterly solid waste reports from Taylor Ridge for the fourth quarter of 1993 and the first and second quarters of 1994 were filed late and the fees reported due had not been paid. It further alleged that Sangamon Valley had filed its reports and paid its fees late for each of these three quarters.

Count II alleged that both Taylor Ridge and Sangamon Valley filed their "significant modification applications" late. In September

1990, the Board adopted new landfill regulations. Those facilities that intended to remain open and be subject to the new more stringent regulations were required to submit an application for a significant modification to their permits; applications were due within four years of the effective date of the regulations or at such earlier time as the Illinois Environmental Protection Agency (Agency) specified. 35 Ill. Adm. Code §§814.104(a),(c) (1994). Facilities unwilling to comport with the new regulations were to close within two years. 35 Ill. Adm. Code §814.104(a) (1994). The amended complaint alleged Taylor Ridge filed its significant modification application in September 1994, one year past its Agency-imposed deadline. Sangamon Valley's first application was also filed late, deemed incomplete by the Agency and withdrawn, and a second application was filed in September 1994.

Count III summarized past violations found in two circuit court enforcement actions against the landfills. Count IV alleged Sangamon Valley failed to file a biennial revision of its closure cost estimate, which had been due in March 1994. Landfill operators are required to regularly revise their estimates of the funds necessary to be held on deposit to cover closure costs. 35 Ill. Adm. Code §807.623 (1994).

Petitioner admitted the allegations of the complaint, but contended that the permit revocations and monetary penalties sought by the State were inappropriate. On November 21, 1994, the Board conducted a hearing to determine the appropriate penalty.

## II. THE ADMINISTRATIVE HEARING

### A. Quarterly Reports and Fees

At the hearing, Melvin Henson, the Agency's manager of its waste accounting fees unit, testified that Sangamon Valley and Taylor Ridge had a history of delinquency when it came to filing solid waste reports and paying fees. Prior to the current violations, Sangamon Valley made four late payments, thrice paying with checks drawn on insufficient funds. From 1987 through 1993, Taylor Ridge submitted fees and reports late on 10 occasions. On one occasion, when a Taylor Ridge check did not clear, the Agency was forced to pursue an offset procedure, whereby collection was received through a setoff against State Comptroller's checks payable to the debtor. Henson testified that such untimely submissions, checks drawn on accounts with insufficient funds, and collection efforts increase the Agency's work load.

James Watts testified that quarterly fee payments were late for a variety of reasons, but primarily due to "cash flow problems."

Petitioner's parent company, Watts Trucking, had gross revenues of approximately $60 million in 1993, with net profits of $500,000 for the last two years. For the two or three years prior to that, Watts described the net profits as "flat," by which he meant net profits in the $200,000 to $300,000 range.

Watts further testified that the Sangamon Valley and Taylor Ridge landfills were primarily used by Watts' hauling companies, and that payments between Watts' hauling companies and the landfills were "merely a paperwork transaction between companies." When asked where the money that Watts' haulers collect from their customers goes, Jerry Eilers, vice-president of Watts Trucking, answered that they look at the parent company and its 17 subsidiaries as a "pool of money" from which capital expenditures and operating expenses are paid based on business decisions regarding priorities. The Watts companies do not set aside any funds specifically earmarked to pay the quarterly fees or other governmental obligations.

Watts further testified, with regard to cash flow, that the landfills had undercharged customers in the past and that income from the landfills varied from month to month. According to Watts, Sangamon Valley had to go through the City of Springfield to raise its rates and had "carried" one customer with an arrearage exceeding $1 million "for quite a period of time." During the period of late payments, the Watts companies had met other obligations, including Watts' own salary of $365,000, and had added staff and equipment. Watts stated the companies were "evolving" into a bigger, more sophisticated company with a larger, more competent management structure. Watts stated that he had never intended to avoid the fee requirements, and all quarterly fees and reports due had been submitted by the time of the hearing.

### B. Significant Modification Applications

Edwin Bakowski, Jr., the solid waste branch manager in the Agency's permit section, testified regarding petitioner's failure to timely file significant modification applications. Bakowski explained that in 1990 the Agency adopted new landfill regulations; within six months of the September 1990 effective date, facilities were required to notify the Agency of their intent to cease operations or remain open subject to the new regulations. Those facilities that intended to remain open and be subject to the new rules were required to submit an application for a significant modification of their permits. By regulation, applications were due within four years of the effective date or such earlier time as the Agency specified. 35 Ill. Adm. Code §814.104(c) (1994).

At the time of the new regulations, there were approximately 150 operating landfills in Illinois which the Agency would be dealing with either in the context of reviewing significant modification applications or permitting action on closure. Bakowski explained the Agency's "call-in" program whereby deadlines for significant modification applications were set. Because of the Agency's finite resources and personnel, as well as the finite number of private consulting firms that would be involved in aiding facilities to prepare their applications, it was important to stagger the deadlines in order to provide for a systematic review process.

With respect to Sangamon Valley, Bakowski testified that it reported its intention to remain open in March 1991, and in March 1992 the Agency issued a "call-in" letter, setting Sangamon Valley's application's due date as September 15, 1992. In the summer of 1992, Sangamon Valley requested a six-month extension which was granted to March 1, 1993. A partial second extension was also granted to May 1, 1993. Two days after its March 1, 1993, deadline, Sangamon Valley requested a third extension, which the Agency denied.

Sangamon Valley submitted a significant modification application on December 6, 1993, nine months after its extended due date. In January 1994, the Agency deemed the application incomplete. Sangamon Valley withdrew the application and submitted a second application in September 1994, which was also deemed incomplete.

With respect to Taylor Ridge, the Agency issued a call-in letter in April 1993, setting a deadline of September 1, 1993. Taylor Ridge apparently never sought or received an extension. Taylor Ridge submitted its application in September 1994. That application was deemed incomplete by the Agency. (The Sangamon Valley and Taylor Ridge applications were finally deemed complete in December 1994, based upon application materials submitted shortly before the hearing.)

Watts and employees of petitioner testified that the lateness of their application was primarily due to the work load of Rapps Engineering, their private consultant. Rapps Engineering was overbooked, handling five or six additional significant modification accounts while working for petitioner. Exacerbating these work load problems were petitioner's cash-flow problems. Rapps Engineering would delay work when pay was not forthcoming. In July 1993, petitioner hired a different consulting firm.

## C. Biennial Revision

Bakowski testified that landfills are required to file a revision of their cost estimates for closure and post-closure care at least once every two years. 35 Ill. Adm. Code §807.623 (1994). The purpose of

such biennial revisions is to ensure that, if the landfill should ultimately have to close, it would have sufficient funds deposited. Under the terms of its current permit, Sangamon Valley was required to file a biennial revision by March 1994, but failed to do so. Closure cost estimates were included in Sangamon Valley's (incomplete) significant modification application, but these estimates did not comport with the requirements of "rule 807."

Eilers testified that there were times in the past when Sangamon Valley did not have enough money on deposit to cover closure costs, but it had corrected those problems. Sangamon Valley currently had $700,000 on deposit to cover closure costs.

## D. Prior Violations

The State introduced evidence of prior enforcement actions against (1) Sangamon Valley before the Honorable Judge Leo J. Zappa (the Zappa matter), and (2) Taylor Ridge before the Honorable Judge Richard J. Cadagin (the Cadagin matter). The Zappa matter involved a 12-count complaint in which the court found in favor of the State on all counts after a trial. Among the violations Judge Zappa found proved were inadequate cover, failure to take adequate means to control leachate, discharging contaminates, failure to maintain adequate closure funds, failure to pay a previous $3,000 penalty, unreasonable noise emission, and failure to timely pay quarterly fees four times between 1987 and 1992.

In September 1992, Judge Cadagin entered a preliminary injunction order against Taylor Ridge for multiple violations of each of the following: inadequate cover, litter, refuse in standing water, leachate violations, water pollution, inadequate financial assurance and failure to pay quarterly fees.

In its post-hearing brief, the State asked the Board to take official notice of its own records of 19 prior administrative citation cases against petitioner. The State requested that the Board revoke petitioner's landfill operating permits or, in the alternative, impose civil penalties of $254,100.

## III. THE BOARD'S DECISION

In its May 4, 1995, decision, the Board declined to revoke the landfills' operating permits, but imposed a total penalty of $60,000 on petitioner. The Board found the evidence insufficient to pierce the corporate veil and hold Watts or Watts Trucking responsible for the violations.

Of the $60,000 penalty, $30,000 was imposed for the late payment of quarterly fees. The Board explained that it would assume that petitioner could have borrowed money at an interest rate of

10% per annum to timely pay the fees owed the State of Illinois, and an additional charge of 10% per annum was necessary to remove the economic incentive for late payments and to deter future violation. The Board calculated the penalty as follows:

*Sangamon Valley*

| | | |
|---|---|---|
| 1993 fourth quarter fees ($55,829) | 96 days late | $ 2,800 |
| 1994 first quarter fees ($51,671) | 152 days late | 4,300 |
| 1994 second quarter fees ($36,631) | 61 days late | 1,200 |

*Taylor Ridge*

| | | |
|---|---|---|
| 1993 fourth quarter fees ($86,861) | 282 days late | 13,000 |
| 1994 first quarter fees ($57,609) | 192 days late | 5,800 |
| 1994 second quarter fees ($65,631) | 101 days late | 3,300 |
| | Rounded Penalty Total | $30,000. |

The Board found that petitioner received an economic benefit from not expending the time and effort to timely file six quarterly reports, but it would take into account that petitioner was now in compliance. Petitioner was fined a flat $2,500 for each late report, for a total of $15,000.

The Board characterized petitioner's failure to timely file the two significant modification applications as a "substantial violation," noting that all landfills were required to file such applications or begin closure. The Board fined petitioner $5,000 for each late application, or $10,000.

Finally, the Board noted that petitioner's failure to timely file the biennial revision benefitted the petitioner economically because it was able to delay paying an expert to perform the review and it did not have to revise its closure funds. The Board noted that petitioner was now in compliance, but fined it $5,000 to deter future violations. Because petitioner's violations were wilful, knowing, and repeated, the Board assessed it $4,980 in attorney fees. See 415 ILCS 5/42(f) (West 1992).

## IV. ANALYSIS

■ Section 33(b) of the Act authorizes the Board to impose civil penalties for violations of "the Act or of the Board's rules and regulations or of any permit or term or condition thereof *** in accord with Section 42 of this Act." 415 ILCS 5/33(b) (West 1992). Section 42(a) of the Act provides for a civil penalty not to exceed $50,000 for each violation and an additional penalty not to exceed $10,000 for each day the violation continues. 415 ILCS 5/42(a) (West 1992).

The Board is vested with broad discretionary powers in the

imposition of civil penalties, and its order will not be disturbed upon review unless it is clearly arbitrary, capricious or unreasonable. *Modine Manufacturing Co. v. Pollution Control Board*, 193 Ill. App. 3d 643, 647, 549 N.E.2d 1379, 1382 (1990). Nonetheless, the Act does not confer upon the Board the authority to impose a civil penalty in every case of a violation of the Act or regulations. *Southern Illinois Asphalt Co. v. Pollution Control Board*, 60 Ill. 2d 204, 208, 326 N.E.2d 406, 408 (1975). The record must demonstrate an adequate rationale for the imposition of the penalty, and the penalty must be "commensurate with the seriousness of the infraction." *Trilla Steel Drum Corp. v. Pollution Control Board*, 180 Ill. App. 3d 1010, 1013, 536 N.E.2d 788, 790 (1989). However, the Act clearly authorizes the Board to assess civil penalties for violations regardless of whether those violations resulted in actual pollution. 415 ILCS 5/1 *et seq.* (West 1992); *Park Crematory, Inc. v. Pollution Control Board*, 264 Ill. App. 3d 498, 501-02, 637 N.E.2d 520, 523 (1994).

■ Section 33(c) of the Act provides:

"(c) In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved;

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source; and

(v) any subsequent compliance." 415 ILCS 5/33(c) (West 1992).

These factors are of questionable relevance in a case like the present one, where the violation of Agency deadlines, and not the emission of pollutants, is at issue. Nevertheless, the Board addressed each of the section 33(c) factors in its written order. In considering the five section 33(c) factors, the Board found in petitioner's favor on all except section 33(c)(V) (subsequent compliance). The Board duly noted that petitioner's violations involved no immediate environmental harm, but noted its compliance with some of the violations came only after the filing of a complaint. Moreover, petitioner's most recent late payments of quarterly fees were in violation of Judge Zappa's court order. The Board quite reasonably concluded that petitioner had not exercised "good faith."

■ More pertinent to cases involving no discharge of pollutants

are the factors listed in section 42(h) of the Act. 415 ILCS 5/42(h) (West 1992). Section 42(h) is a recent addition to the Act which became effective September 7, 1990. Pub. Act 86—1363, §2002, eff. September 7, 1990 (1990 Ill. Laws 2798, 2804). In determining the appropriate civil penalty, the Board is to consider any matters of record in mitigation or aggravation, including:

"(1) the duration and gravity of the violation;

(2) the presence or absence of due diligence on the part of the violator in attempting to comply with requirements of this Act and regulations thereunder or to secure relief therefrom as provided by this Act;

(3) any economic benefits accrued by the violator because of delay in compliance with requirements;

(4) the amount of monetary penalty which will serve to deter further violations by the violator and to otherwise aid in enhancing voluntary compliance with this Act by the violator and other persons similarly subject to the Act; and

(5) the number, proximity in time, and gravity of previously adjudicated violations of this Act by the violator." 415 ILCS 5/42(h)(1) through (h)(5) (West 1992).

■ Illinois courts often state that the primary purpose of civil penalties is to aid in enforcement of the Act, and punitive considerations are secondary. *Modine Manufacturing*, 193 Ill. App. 3d at 648, 549 N.E.2d at 1382; *Trilla Steel Drum Corp.*, 180 Ill. App. 3d at 1013, 536 N.E.2d at 790; *City of Moline v. Pollution Control Board*, 133 Ill. App. 3d 431, 433, 478 N.E.2d 906, 908 (1985). Some decisions which predate section 42(h) seem to suggest that whenever compliance has been achieved, punishment is unnecessary. See, *e.g.*, *City of Moline*, 133 Ill. App. 3d at 433, 478 N.E.2d at 908. However, it is now clear from the section 42(h) factors that the deterrent effect of penalties on the violator and potential violators is a legitimate goal for the Board to consider when imposing penalties.

■ The Board addressed each of the section 42(h) factors in depth in its written order. The Board concluded that petitioner's lack of diligence, the economic benefits gained by untimely filings, the necessity of deterring future violation, and petitioner's past history of violations should all aggravate the penalty imposed. We find the Board's discussion of the section 42(h) factors to be well reasoned, and we will not disturb the Board's findings.

Petitioner contends, however, that the $60,000 penalty is not commensurate with the low seriousness of the violations. Petitioner notes that no environmental harm was caused by the violations and that it was in compliance with all regulations at the time of the order. However, evidence was presented regarding petitioner's failure

to comply with many regulations until after enforcement proceedings were initiated, of the hardship imposed upon the Agency in collecting monies due, and the necessity of deadlines to ensure the smooth operation of the Agency. The Board's decision that a stiff penalty was warranted to deter future violations was neither arbitrary nor capricious.

Petitioner argues that the penalty was excessively stiff in light of other cases, especially *Park Crematory*. In *Park Crematory*, the appellate court vacated a $9,000 penalty assessed by the Board for the unpermitted operation of an incinerator for nine years. There, the incinerator operator realized almost no economic advantage from its noncompliance, was "not beyond the regulatory awareness of the Agency," and acted in good faith. *Park Crematory*, 264 Ill. App. 3d at 504, 637 N.E.2d at 525. Here, the Board found that petitioner did not act in good faith. Moreover, it is difficult to characterize the penalties imposed here as excessive, where the legislature has now authorized fines of $50,000 for each violation, plus $10,000 for each additional day of noncompliance. 415 ILCS 5/42(a) (West 1992). Although *Park Crematory* was decided after the legislature enacted these increased penalties, most of the violations at issue there occurred when the maximum penalty was $10,000 for each violation, plus $1,000 for each additional day of noncompliance. This fact may have influenced the court's decision that a $9,000 penalty was excessive. Here, all of petitioner's violations occurred when the new penalties were in effect. The penalty imposed was a small fraction of the theoretical maximum, and despite petitioner's tardiness, the Board imposed no additional penalty for each day of noncompliance.

Petitioner challenges the Board's finding that it received an economic benefit from noncompliance. Although the evidence to support any economic benefit gained through the late filing of reports is slight to nonexistent, we deem it reasonable to assume petitioner received the "time value of money" by delaying the expenditures necessary to prepare such reports. Certainly, petitioner received an economic benefit by delaying its payment of quarterly fees.

Finally, petitioner raises several challenges to the Board's consideration of prior violations in aggravation of the penalty. First, petitioner challenges the Board's reliance on the preliminary injunction order entered by Judge Cadagin, wherein Judge Cadagin found that Taylor Ridge was in violation of numerous regulations. Petitioner cites *People ex rel. Hartigan v. National Anti-Drug Coalition*, 124 Ill. App. 3d 269, 273, 464 N.E.2d 690, 694 (1984), for the proposition that a preliminary injunction "does not decide controverted facts or the merits of the cause; rather it only shows that suf-

ficient cause has been made to authorize or require the court to preserve the rights in issue until a final hearing on the merits." Petitioner asserts that therefore the findings contained in a preliminary injunction order do not rise to the level of a "previously adjudicated violation" for purposes of section 42(h)(5) of the Act. 415 ILCS 5/42(h)(5) (West 1992).

We disagree. An action for injunctive relief for violations of the Act is not governed by normal equitable considerations, and once a violation of the Act is shown, an injunction to enforce the terms of the Act must issue. *People v. Mika Timber Co.*, 221 Ill. App. 3d 192, 193, 581 N.E.2d 895, 897 (1991). Here, the Cadagin order was unfortunately vague, and it was not a binding determination on the merits, but these factors go only to the weight to be afforded the prior violations. The Board is allowed wide discretion under section 42(h) of the Act to consider any factor in aggravation and mitigation of the penalty. It is noteworthy that petitioner was given an opportunity to contest the substance of the violations contained in the Cadagin order but chose not to do so.

Petitioner next challenges the Board's consideration of its 14 prior fee payment violations. Petitioner states that it can find no record of these violations; however, the State clearly presented evidence that Sangamon Valley was delinquent four times and Taylor Ridge was delinquent 10 times between 1987 and 1993. Petitioner suggests that if the fee payment violations were contained in the Cadagin and Zappa matters, the Board counted these violations twice in aggravation. However, the record does not clearly support the assumption that the Board was confused, and we will assume the Board counted correctly.

Petitioner argues that the Board improperly took official notice of the 19 administrative citations issued against it. Petitioner contends due process was offended when the State referred to these administrative citations for the first time in its post-hearing brief.

"Official notice may be taken of all facts of which judicial notice may be taken and of other facts within the specialized knowledge and experience of the Board." 35 Ill. Adm. Code §103.206 (1994). An administrative tribunal may take judicial notice of matters of record in another administrative order, determination, or judgment, especially where these proceedings are related and involve the same parties. *All Purpose Nursing Service v. Human Rights Comm'n*, 205 Ill. App. 3d 816, 823, 563 N.E.2d 844, 848 (1990). Contrary to petitioner's assertion that the citation documents must have been pleaded or produced at the hearing, judicial notice may be taken at any stage of the proceedings. See M. Graham, Cleary & Graham's Handbook of Il-

linois Evidence §203.3 (6th ed. 1994). Petitioner was afforded an opportunity to contest the content and fact of the prior administrative citations in its reply to the State's post-hearing brief, but it chose to object only to the Board taking notice. We find no error or due process violation in the Board taking notice of its records.

Last, petitioner objects to the Board taking notice of the Sangamon Valley violations found proved by Judge Zappa because it was appealing those findings at the time of the hearing. The findings of a circuit court are presumed correct even if still subject to appeal. See *Behrstock v. Ace Hose & Rubber Co.*, 147 Ill. App. 3d 76, 86, 496 N.E.2d 1024, 1030 (1986). Regardless, this court affirmed Judge Zappa's findings in an unpublished Rule 23 order. See *People v. Watts Trucking Service, Inc.*, No. 4—94—0414 (July 14, 1995) (unpublished order under Supreme Court Rule 23).

## V. CONCLUSION

For the foregoing reasons, the opinion and order of the Board is affirmed.

Affirmed.

STEIGMANN and KNECHT, JJ., concur.