# ILLINOIS OFFICIAL REPORTS
## Appellate Court

---

*City of Morris v. Community Landfill Co.*, 2011 IL App (3d) 090847

---

| | |
|---|---|
| Appellate Court Caption | THE CITY OF MORRIS, an Illinois Municipal Corporation, Petitioner-Appellant, v. COMMUNITY LANDFILL COMPANY, an Illinois Corporation, THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois, the ILLINOIS POLLUTION CONTROL BOARD, and The STATE OF ILLINOIS, Respondents-Appellees.–COMMUNITY LANDFILL COMPANY, an Illinois Corporation, Petitioner-Appellant, v. ILLINOIS POLLUTION CONTROL BOARD, THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois, THE CITY OF MORRIS, an Illinois Municipal Corporation, and The STATE OF ILLINOIS, Respondents-Appellees. |
| District & No. | Third District<br>Docket Nos. 3-09-0847, 3-09-0864 cons. |
| Filed | August 5, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action alleging violations of the Environmental Protection Act and regulations adopted by the Pollution Control Board arising from a landfill company's operation of a waste disposal facility on land owned by a city, the appellate court confirmed the Board's findings that the landfill company violated the Act's financial assurance obligation, and its imposition of a penalty and issuance of a cease and desist order, but the appellate court set aside rulings against the city based on findings that the city did not violate the Act or its regulations, that it was not responsible for obtaining financial assurance for the landfill, and that it was not liable for any civil penalty. |

| Decision Under Review | Petition for review of order of Pollution Control Board, No. 03-191. |
| --- | --- |
| Judgment | Confirmed in part and set aside in part; cause remanded. |
| Counsel on Appeal | Nancy G. Lischer, of Hinshaw & Culbertson, of Chicago, George F. Mahoney III, R. Peter Grometer (argued), and Grant S. Wegner, all of Mahoney, Silverman & Cross LLC, of Joliet, Charles F. Helsten, of Hinshaw & Culbertson, of Rockford, and Scott M. Belt, of Scott M. Belt & Associates, P.C., of Morris, for City of Morris. |
| | Mark A. LaRose (argued), of LaRose & Bosco, Ltd., and Clarissa Y. Cutler, both of Chicago, and Michael T. Reagan, of Law Offices of Michael T. Reagan, of Ottawa, for Community Landfill Company. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Laura M. Wunder (argued), Assistant Attorney General, of counsel), for respondent. |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion. Justices Schmidt and Wright concurred in the judgment and opinion. |

## OPINION

¶ 1    The State filed a complaint with the Illinois Pollution Control Board (Board) against Community Landfill Co. (CLC) and the City of Morris, alleging that CLC and the City were conducting disposal operations in violation of the financial assurance requirements of the Environmental Protection Act (Act) (415 ILCS 5/21 (West 2008)) and regulations promulgated thereunder by the Board. The State filed a motion for summary judgment, which the Board granted. The Board then entered an order (1) holding CLC and the City jointly and severally liable for posting financial assurance of $17,427,366, (2) prohibiting CLC and the City from accepting additional waste at the landfill, and (3) imposing penalties of $399,308.98 against the City and $1,059,534.70 against CLC. CLC and the City appeal the Board's rulings. We confirm in part and set aside in part.

¶ 2    In the 1970s, the City of Morris operated the Morris Community Landfill. The landfill consists of two parcels, A and B. In 1982, the City transferred its interest in the landfill to

CLC, but retained ownership of the land on which the landfill was situated. CLC began operating the landfill. CLC paid the City dumping-related royalties for its use of the landfill.

¶ 3 In 1996, CLC secured financial assurance from bonds issued by Frontier Insurance for closure/postclosure care costs for the landfill. Prior to 1999, CLC carried $1.4 million in bonds from Frontier, the estimated closure costs at that time.

¶ 4 In 1999, the City and CLC entered into an agreement that required CLC to give leachate from the landfill to the City, which the City then treated at its publicly owned treatment works at no cost to CLC. The leachate from the landfill made up less than 1% of what was treated at the City's publicly owned treatment works.

¶ 5 In 1999, CLC submitted an application to the Illinois Environmental Protection Agency (IEPA) for a significant modification permit requesting the closure of parcel B and the continued operation of parcel A. The permit estimated that closure costs for CLC would be $7 million and the costs for the City would be $10 million for leachate treatment. CLC sought to post a $7 million bond, while the City would commit to leachate treatment costing $10 million. IEPA rejected CLC's application and required CLC to post a bond for the entire $17 million. CLC and the City appealed that decision to the Board and then to this court, both of which upheld the $17 million financial assurance amount. See *Community Landfill Co.*, Ill. Pollution Control Bd. Op. 01-48, 01-49 (cons.) (Apr. 5, 2001); *Community Landfill Co. v. Pollution Control Board*, No. 3-01-0552 (2001) (unpublished order under Supreme Court Rule 23).

¶ 6 In 2000, IEPA issued a modification permit supported by financial assurance of $17,427,366, which was guaranteed by three bonds issued by Frontier. One of the bonds, with a value of $10,081,630, listed the City as principal. The remaining bonds listed CLC as the principal. CLC was responsible for the premiums on all of the bonds.

¶ 7 A few months later, IEPA notified CLC and the City that they were in violation of the Act because Frontier Insurance Company had been taken off the list of approved government sureties. Two weeks later, CLC filed its supplemental permit application for parcel A. IEPA denied the application because Board regulations required acceptable sureties to be listed in the United States Department of Treasury's Circular 570, and Frontier was stricken from the list. CLC and the City appealed IEPA's decision. The Board affirmed IEPA's denial of CLC's permit. *Community Landfill Co.*, Ill. Pollution Control Bd. Op. 01-170, at 22 (Dec. 6, 2001). CLC and the City then appealed to this court. We confirmed, holding:

> "[T]he supplemental permit application in this case was appropriately denied because the company failed to satisfy *** requirements of the Act and Code when seeking the permit. Although the parties do not dispute that the bonds were valid and enforceable or that the Agency accepted the company's bonds for a different permit after Frontier was removed from the Circular 570 list, Frontier did not meet the statutory financial assurance requirements for the supplemental permit here as it was not on the list of approved sureties when this application was submitted and ruled on." *Community Landfill Co. v. Pollution Control Board*, 331 Ill. App. 3d 1056, 1061 (2002).

¶ 8 In 2003, the State filed a complaint against CLC and the City, alleging that they were conducting disposal operations at the Morris Community Landfill without adequate financial

assurance. The State filed a motion for summary judgment against CLC and the City. CLC filed a response arguing that there was an issue of fact as to whether it had adequate financial assurance in place. The City filed a cross-motion for summary judgment, arguing that it had no responsibility to post financial assurance because it did not conduct or manage operations at the landfill. In 2006, the Board issued an opinion and order granting the State's motion for summary judgment and denying the City's motion for summary judgment.

¶ 9        In September 2007, a penalty hearing was held. Evidence at the hearing established that CLC paid the City $399,208.98 in dumping royalties from 2001 to 2005. The evidence also showed that CLC's premium payment for the Frontier bonds was $217,842 in 2001, which amounted to $596.83 per day. CLC stopped making payments on the Frontier bonds in 2001. Neither CLC nor the City provided any financial assurance to IEPA for the landfill after 2001.

¶ 10       Brian White, IEPA Bureau of Land Compliance unit manager, testified that IEPA has made a claim on the Frontier bonds obtained by the City and CLC in 2000. Frontier offered to pay IEPA $400,000 on those bonds. At the time of the hearing, Frontier had paid nothing.

¶ 11       Christine Roque, IEPA Bureau of Land engineer, testified that financial assurance amounts may be reduced by seeking and obtaining a permit modification from IEPA. CLC and the City did not seek a permit modification for the Morris Community Landfill until July 2007. That permit modification was under review by IEPA at the time of the hearing.

¶ 12       Devin Moose, a licensed professional engineer, was hired by the City in 2005 to evaluate the landfill. Moose prepared revised cost estimates for closure/postclosure care and found them to be $10 million. The revised figures were submitted to IEPA in July 2007, but IEPA had not yet responded to them.

¶ 13       Edward Pruim, secretary/treasurer of CLC, testified that the cost of the Frontier bonds in 2000 was $200,000 in collateral and premium payments of slightly over $200,000 per year. CLC paid the premium on the Frontier bonds for two years. CLC then began looking for another bonding company and found that it did not have enough money to purchase other bonds.

¶ 14       Following the hearing, each party filed posthearing briefs. In its brief, the State argued that the Board should impose a penalty against CLC in the amount of $1,059,534.70, reflecting the amount it saved on bond premiums by not paying for any bonds after 2001. The State argued that the penalty against the City should be $399,308.98, the amount of dumping royalties it received from CLC from 2001 to 2005, when no financial assurance was in place for the landfill.

¶ 15       In 2009, the Board issued an order in which it found CLC and the City jointly and severally obligated to post financial assurance in the amount of $17,427,366, to be reduced by any amount IEPA has or will receive from Frontier. *Community Landfill Co.*, Ill. Pollution Control Bd. Op. 03-191, at 3, 35 (June 18, 2009). The Board also ordered both CLC and the City to (1) submit revised cost estimates and update financial assurance in accordance with the revised estimates, and (2) cease and desist from accepting any additional waste at the landfill. *Id*. at 3. The Board imposed penalties of $399,308.98 against the City and $1,059,534.70 against CLC. *Id*.

¶ 16                    I. VIOLATION OF ACT AND REGULATIONS

¶ 17                              A. CLC's Liability

¶ 18       CLC argues that the Board erred in finding that it violated the Act and its regulations by not obtaining adequate financial assurance because the Frontier bonds were valid and enforceable, as evidenced by IEPA's attempt to collect on them.

¶ 19       Section 21 of the Act provides that "[n]o person shall *** [c]onduct any waste-storage, waste-treatment, or waste-disposal operation *** in violation of any regulations or standards adopted by the Board under this Act." 415 ILCS 5/21(d)(2) (West 2008). Section 811.700 of the Board's Financial Assurance Regulations states that "no person *** shall conduct any disposal operations at an MSWLF [municipal solid waste landfill facility] unit *** unless that person complies with the financial assurance requirements of this Part." 35 Ill. Adm. Code 811.700(f) (2011). Financial assurance may be provided by a bond guaranteeing payment or performance. 35 Ill. Adm. Code 811.700(b) (2011). The surety company issuing bonds must be "approved by the U.S. Department of the Treasury as an acceptable surety." 35 Ill. Adm. Code. 811.712(b) (2011). The Department of the Treasury lists acceptable sureties in its Circular 570. 35 Ill. Adm. Code 811.712(b) (2011).

¶ 20       In 1999, IEPA determined that CLC was required to post over $17 million in financial assurance for the Morris Community Landfill. In May 2000, CLC and the City purchased $17.1 million in bonds from Frontier. On June 1, 2000, Frontier was removed from the Circular 570 list. See *Community Landfill Co. v. Pollution Control Board*, 331 Ill. App. 3d at 1059. CLC never obtained any financial assurance in addition to or in lieu of the Frontier bonds and stopped paying premiums on the Frontier bonds in 2001. Nevertheless, CLC continued to conduct waste disposal operations at the landfill.

¶ 21       As we explained in *Community Landfill Co.*, the Frontier bonds were valid and enforceable. *Community Landfill Co.*, 331 Ill. App. 3d at 1061. Nevertheless, they did not satisfy the requirements of the Act or the Code because Frontier was removed from the list of approved sureties. *Id*. Moreover, CLC stopped paying premiums on the Frontier bonds in 2001. In 2003, when the State filed its complaint, CLC was already in substantial violation of the Board's financial assurance regulations and section 21 of the Act. Thus, the Board properly granted summary judgment against CLC.


¶ 22                              B. The City's Liability

¶ 23       The City argues that the Board should not have found it liable for providing financial assurance for the landfill because the City did not "conduct disposal operations."

¶ 24       An entity is responsible for obtaining financial assurance for a landfill if it "conduct[s] any disposal operation at an MSWLF unit." 35 Ill. Adm. Code 811.700 (2011). The Act defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking or placing of any waste or hazardous waste into or on any land or water or into any well." 415 ILCS 5/3.185 (West 2008). The parties do not dispute that parcels A and B of Morris Community Landfill qualify as MSWLF units.

¶ 25    Here, the Board found that while the City did not "conduct the day-to-day operations at the landfill," the City was an operator of the landfill and, thus, responsible for financial assurance:

> "While Morris may not actively conduct the day-to-day operations at the landfill, Morris also does not 'passively own land upon which waste disposal operations are (or have been) conducted.' [Citation.] Morris financed the operation, litigated in conjunction with CLC, as well as profited from and treated the leachate from the Morris Community Landfill. While these activities alone may not constitute 'operating' a waste disposal site, Morris also had discretion regarding the decisions at the site and took responsibility for some of the ancillary site operations such as the treatment of leachate from the landfill. The Board finds that the grand sum of Morris' conduct rises to the level of 'operation' ***". (Internal quotation marks omitted.) *Community Landfill Co.*, Ill. Pollution Control Bd. Op. 03-191, at 4 (Feb. 16, 2006).

¶ 26    The PCB's regulations define "operator" as "a person who is responsible for the operation and maintenance of a solid waste disposal facility." 35 Ill. Adm. Code 810.103 (2011). A court may look beyond permits to determine who is involved in the day-to-day operations of a landfill to determine who is an operator. *People ex rel. Ryan v. Bishop*, 315 Ill. App. 3d 976, 979-80 (2000). An entity will be regarded as an operator if it is involved in the day-to-day operations of the site. *Poland*, Ill. Pollution Control Bd. 98-148, at 8-9 (Sept. 6, 2001). An owner will be considered an operator when it pays for all site operations, directs and supervises the "operator" on an ongoing basis and limits the discretion of the "operator." See *Termaat*, Ill. Pollution Control Bd. 85-129, at 3-5 (Oct. 23, 1986).

¶ 27    Here, there was no evidence that the City oversaw, directed or supervised CLC in its waste disposal operations. While the City helped CLC obtain financial assurance, litigated alongside CLC on various issues and treated leachate from the landfill, those activities were separate and distinct from CLC's "waste disposal operation" at the landfill. Moreover, the leachate the City received from CLC amounted to a very small percentage of the total leachate the City treated at its publicly owned treatment works. Thus, the City's treatment of the leachate did not amount to an ancillary site operation of the landfill. See 35 Ill. Adm. Code 811.309(e)(1)(c) (2011) (treatment works considered part of a landfill only if more than 50% of the average daily influent flow is attributable to leachate from the landfill).

¶ 28    The Board specifically found that the City was not involved in day-to-day operations of the landfill. *Community Landfill Co.*, Ill. Pollution Control Bd. Op. 03-191, at 13 (Feb. 16, 2006); *Community Landfill Co.*, Ill. Pollution Control Bd. Op. 03-191 at 3, 4, 28 (June 18, 2009). That finding is the test for determining if an entity is "conducting waste operations," not litigation activities, financial support or minor amounts of leachate treatment. The Board erred in finding that the City was conducting a waste disposal operation and responsible for obtaining financial assurance. The Board's order granting summary judgment in favor of the State and against the City was improper.

## II. FINANCIAL ASSURANCE

### A. CLC's Liability

¶ 31    CLC argues that the Board's order requiring it to obtain $17.4 million in financial assurance was improper because (1) it already had financial assurance in place by way of the Frontier bonds, and (2) the appropriate amount of financial assurance necessary for closure/postclosure costs was still in dispute.

¶ 32    Section 33 of the Act provides: "After due consideration of the written and oral statements, the testimony and arguments that shall be submitted at the hearing, *** the Board shall issue and enter such final order, or make such final determination, as it shall deem appropriate under the circumstances." 415 ILCS 5/33 (West 2008).

¶ 33    CLC's first argument that it had adequate financial assurance in place through the Frontier bonds is not supported by the evidence. The evidence at the hearing established that the Frontier bonds purchased in 2000 did not comply with the Act or regulations and that CLC stopped paying premiums on those bonds in 2001. Thus, from 2000 to the time of the hearing, CLC did not have proper financial assurance in place. The Board's order requiring CLC to obtain compliant financial assurance was proper.[1]

¶ 34    Moreover, the amount of financial assurance ordered by the Board was supported by the evidence. In 2000, CLC estimated that closure/postclosure care of the landfill would cost $17.4 million, and IEPA issued a modification permit to CLC based on that cost estimate. At the hearing in September 2007, CLC presented testimony that only $10 million was necessary to cover closure/postclosure costs at the landfill. While CLC could have provided IEPA with revised estimates of closure/postclosure costs at any time, CLC did not present its revised cost estimates to IEPA until July 2007. At the time of the hearing, IEPA had not yet determined if CLC's modified cost estimates were proper and could be accepted. Because the only amount of closure/postclosure costs approved by IEPA at the time of the hearing was $17.4 million, the Board did not err in requiring CLC to obtain financial assurance in that amount, less any amount tendered by Frontier to IEPA.

### B. The City's Liability

¶ 36    The City argues that the Board should not have found it jointly and severally liable for obtaining $17.4 million in financial assurance for the Morris Community Landfill since it is not "conducting waste disposal operations." We agree.

¶ 37    An entity is responsible for obtaining financial assurance for a landfill if it "conduct[s] any disposal operation at an MSWLF unit." 35 Ill. Adm. Code 811.700(f) (2011). Since we have found that the City is not conducting disposal operations, it had no obligation to obtain financial assurance. The Board's order finding the City jointly and severally liable for obtaining financial assurance for the landfill was improper.

---

[1]While IEPA has attempted to collect from Frontier on the noncompliant bonds, the $400,000 offered by Frontier was far less than $17.4 million. Frontier has yet to pay IEPA any amount.

¶ 38                                 III. PENALTIES

¶ 39                                 A. CLC

¶ 40      CLC argues that the Board abused its discretion in imposing a penalty of $1,059,534.70 against it because it acted reasonably in purchasing the Frontier bonds and did not benefit from noncompliance.

¶ 41      Section 42 of the Act authorizes the Board to impose a civil penalty of up to $10,000 per day against any person who violates a provision of the Act or regulation adopted by the Board. 415 ILCS 5/42(a) (West 2008). Section 42(h) lists a number of factors that the Board is to consider when determining the appropriate penalty, including:

> "(1) the duration and gravity of the violation;
>
> (2) the presence or absence of due diligence on the part of the respondent in attempting to comply with requirements of this Act and regulations thereunder ***;
>
> (3) any economic benefits accrued by the respondent because of delay in compliance with requirements, in which case the economic benefit shall be determined by the lowest cost alternative for achieving compliance;
>
> (4) the amount of monetary penalty which will serve to deter further violations by the respondent and to otherwise aid in enhancing voluntary compliance with this Act by the respondent and other persons similarly subject to the Act;
>
> (5) the number, proximity in time, and gravity of previously adjudicated violations of this Act by the respondent." 415 ILCS 5/42(h) (West 2008).

Section 42(h) also states:

> "In determining the appropriate civil penalty to be imposed ***, the Board shall ensure, in all cases that the penalty is at least as great as the economic benefits, if any, accrued by the respondent as a result of the violation, unless the Board finds that imposition of such penalty would result in an arbitrary or unreasonable financial hardship." 415 ILCS 5/42(h) (West 2008).

¶ 42      The Board is vested with broad discretionary powers in imposing penalties. *ESG Watts, Inc. v. Pollution Control Board*, 282 Ill. App. 3d 43, 50-51 (1996). A penalty will be set aside only if it is clearly arbitrary, capricious or unreasonable. *Id*. at 51.

¶ 43      Here, the Board considered the section 42(h) factors and found only one mitigating factor in CLC's favor–no prior adjudicated administrative citation violations. *Community Landfill Co.*, Ill. Pollution Control Bd. 03-191, at 39 (June 18, 2009). On the other hand, the Board found the aggravating factors to be "many and severe." *Id*. The Board explained that "the on-going, grave financial assurance violations in this case [that] have persisted since 2000, leaving unresolved problems at the Landfill," required that it impose a significant penalty against CLC. *Id*. at 40. The Board found that the appropriate measure of the civil penalty against CLC was the amount of money CLC saved by not paying premiums for the noncompliant Frontier bonds from 2001 to 2007. *Id*. Thus, the Board assessed a penalty against CLC for that amount: $1,059,534.70. *Id*.

¶ 44      We find that the Board's penalty was not arbitrary, capricious or unreasonable. The

penalty was supported by section 42(h), including the mandate that penalties be at least as great as the economic benefits accrued by the respondent as a result of the violation. Here, CLC benefitted financially by not paying premiums on bonds for many years. Thus, the penalty imposed by the Board, which was equal to the premiums CLC should have paid for those bonds, was appropriate.

¶ 45                                                  B. The City

¶ 46      A penalty is authorized under the Act against any person who violates a provision of the Act or a regulation adopted by the Board. 415 ILCS 5/42(a) (West 2008). Because the City did not violate the Act or regulations, the Board erred in imposing a penalty against the City.

¶ 47                                     IV. CEASE AND DESIST ORDER

¶ 48      CLC argues that the Board had no authority to order it to cease and desist from accepting any additional waste at the site because the only issue before the Board was CLC's compliance with statutory and regulatory financial assurance requirements.

¶ 49      Section 33 of the Act authorizes the Board to issue orders and provides that "[s]uch order[s] may include a direction to cease and desist from violations of this Act [or] any rule or regulation adopted under this Act." 415 ILCS 5/33(b) (West 2008).

¶ 50      Section 21 of the Act lists "[p]rohibited acts" and states that "[n]o person shall *** [c]onduct any *** waste disposal operation *** in violation of any regulations or standards adopted by the Board under this Act." 415 ILCS 5/21(d)(2) (West 2008). Section 811.700 of the Board's regulations provides that "no person *** shall conduct any disposal operation at an MSWLF unit *** unless that person complies with the financial assurance requirements of this Part." 35 Ill. Adm. Code 811.700(f) (2011). The Act defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking or placing of any waste or hazardous waste into or on any land or water or into any well." 415 ILCS 5/3.185 (West 2008).

¶ 51      CLC conducts "disposal operations" by accepting waste at the Morris Community Landfill. See 415 ILCS 5/3.185 (West 2008). Such disposal operations are authorized by the Act and its regulations only if adequate financial assurance is in place. See 35 Ill. Adm. Code 811.700(f) (2011). Accepting waste without proper financial assurance is prohibited by the Act and its regulations. See 415 ILCS 5/21(d)(2) (West 2008); 35 Ill. Adm. Code 811.700(f) (2011).

¶ 52      Here, CLC violated the Act and its regulations by accepting waste without proper financial assurance. See 415 ILCS 5/21(d)(2) (West 2008); 35 Ill. Adm. Code 811.700(f) (2011). The Board had the power to direct CLC to cease and desist from violating the Act and its regulations. See 415 ILCS 5/33(b) (West 2008). Thus, the Board acted properly when it prohibited CLC from accepting waste.

¶ 53                                               CONCLUSION

¶ 54      We confirm the Board's (1) finding that CLC violated the Act's financial assurance obligation, (2) requirement that CLC obtain $17.4 million in financial assurance, (3) penalty

of $1,059,534.70 against CLC, and (4) cease and desist order. However, we set aside the Board's rulings against the City and find that the City (1) did not violate the Act or its regulations, (2) is not responsible for obtaining financial assurance for the landfill, and (3) is not liable for any civil penalty.

¶ 55 The order of the Illinois Pollution Control Board is confirmed in part and set aside in part.

¶ 56 Confirmed in part and set aside in part; cause remanded.